WILBERT TAYLOR v. ELY LADERMAN, Appellant.—161 S. W. (2d) 253.

Division Two, March 13, 1942.

Rehearing Denied, May 5, 1942.

*Wilbur C. Schwartz* and *Morton K. Lange* for appellant.

*Everett Hullverson, Henry A. Freytag* and *Gregg W. Keegan* for respondent.

418

WESTHUES, C.—Respondent, Taylor, obtained a judgment in the sum of $15,000.00 against appellant, Laderman, as damages for personal injuries sustained in a car collision while riding in Laderman's car as a guest. From this judgment Laderman appealed.

The collision occurred in the State of Illinois and the laws of that state control this case. Plaintiff in his petition alleged that he sustained his injuries as a direct result of the willful and wanton negligence of the defendant in the operation of his automobile. A statute of the State of Illinois, section 58a, Motor Vehicle Act of Illinois, R. S. 1937, page 2099, provides in substance that a guest injured in an accident cannot recover damages against the driver of such motor vehicle or its owner unless the injuries were caused by the willful and wanton misconduct of the driver. Appellant's first point briefed is, that there was no evidence to prove that he was guilty of willful and wanton misconduct. A brief statement of the facts, as supported by substantial evidence, will suffice to answer this question. Appellant lived in the city of St. Louis, Missouri. His sweetheart, Hazel Scott, who was a professional singer, also lived in St. Louis. Margaret Sigoletto, a piano player, the plaintiff, who played a bass violin, Miss Scott and another party were engaged to play and sing at a tavern in Benld, Illinois. Their work was usually concluded at about 3:00 A. M.. The defendant drove to Benld in his Plymouth coupe on the night of June 5, 1938, for the purpose of taking Miss Scott to her home in St. Louis. He arrived at the tavern at about 1:30 A. M., June 6. Miss Scott had invited Margaret Sigoletto and plaintiff Taylor to ride to St. Louis with them in defendant's coupe. At about 3:30 A. M. they started south on highway 66 toward St. Louis and when they reached a point north of Hamel, Illinois, the defendant's car and a car driven by a Mrs. Audley Behan of Granite City, Illinois, who was traveling north on highway 66, collided, resulting in plaintiff and others being injured. Miss Scott, who had prior to the time of the trial married a man named Trust, testified that the defendant Laderman became angry with her when he arrived at the tavern because she was dancing with a man with whom he had told her not to dance; that this anger was aggravated when he learned that she had asked plaintiff and Miss Sigoletto to ride to St. Louis with them. She further testified that after they started on their

journey the defendant drove at a high rate of speed and when he reached highway 66 drove in the center of the road; that when meeting a truck or car he would suddenly turn towards the shoulder of the road and at times get off the concrete slab. Note her testimony:

"Q. Now, then, what was his attitude, as far as driving was concerned, from then on? A. Well, he was driving pretty fast. I had asked him a couple of times when we first started not to drive too fast, and he just told me to shut up, that was his car to drive the way he wanted to."

. . . . . .

"And there were lot of trucks on the highway on the way home, and lot of times we would get so near I would be scared to ▮▮▮▮ death, I'd think any minute we would run into one, and when a truck would come near us he would pull over then like on his own side, and sometimes he would go all the way off the pavement and go right back over again and start driving terribly fast again. And I begged him to drive more slowly, but he wouldn't pay any attention to me; he was just mad."

Miss Scott further testified that when she first noticed the car with which defendant's car collided it appeared to be zigzagging. Note her evidence:

"Q. I see. And did it stay on its own side all the time or did it zigzag somewhat over the line? A. Oh, a couple of times I think it was practically on the black line in the middle of the highway, and then the car was more on its own side; and when I saw the car coming I told him, 'My goodness, here comes another crazy driver; you better move over.'

"Q. Did he move over? A. No; he told me to shut up.

"Q. Did he slacken the speed of his car any? A. No, he didn't.

"Q. What rate of speed would you say he was traveling at the time, Miss Scott? A. I believe about sixty miles an hour.

"Q. And did he make any effort to stop or pull off the road or slow down? A. No, he didn't.

"Q. What part of the road was he traveling in just before this collision occurred? A. Well, we were coming down the middle of the highway."

All of the above evidence was corroborated by that of the plaintiff. Note a part of his statements:

"Q. What would Laderman do when you would get near those trucks? A. Well, he would swerve off the highway sometimes; he tried—get right up to the trucks and swerve off the highway and got off of the road. Every time he would do that I would ask him to let me drive.

. . . . . .

"Now, when you got near this automobile, this particular one which you were concerned with, did you see the automobile before you collided with it? A. Yes, sir.

"Q. About how far away was it when you first noticed it? A. Oh, it was a quarter of a mile or more.

"Q. And did you notice anything particular about it or not? A. Well, it was on the—about the center of the road, or a little bit over, and he was doing the same thing. I told him he better get out of the way, get over on his own side.

"Q. And did he? A. No, he just kept going.

"Q. And did you hear Miss Scott say anything to him about that time? A. Miss Scott asked him to stop and get off the road." Plaintiff further testified that the defendant did not slacken his speed before the crash and that he turned abruptly to the left immediately before the collision. Appellant in answer to questions on cross-examination testified as follows with reference to being angry:

"Q. And while you didn't say anything loud, you didn't like the proposition of four going home with a coupe; you thought she was a little out of line suggesting it? A. Well, I was driving the car, the rest would be crowded. I told her that.

"Q. And you would be crowded too? A. Possibly.

"Q. And you didn't like the idea, did you? A. Well, I didn't like it, but I didn't object much to it.

"Q. Well, it didn't make you feel very pleasant; it didn't make you happy? A. No."

■ We are of the opinion that the above evidence was sufficient to authorize a jury to find that the defendant was guilty of willful and wanton misconduct in the operation of his car. In support of this holding we need cite only one case taken from appellant's brief, wherein he quoted the following from Clark v. Hasselquist, 304 Ill. App. 41, l. c. 48, 25 N. E. (2d) 900:

" 'To constitute an act wanton, the party doing the act or failing to act must be conscious of his conduct, and, though having no intent to injure, must be conscious, from his knowledge of the surrounding circumstances and conditions, that his conduct will naturally and probably result in injury. An intentional disregard of a known duty necessary to the safety of the person or property of another, and an entire absence of care for the life, person or property of others, such as exhibits a conscious indifference to consequences, makes a case of constructive or legal willfulness.' "

If plaintiff's evidence was true, and the jury found it to be so, then the defendant's misconduct was, under the law, willful and wanton, and hence the point must be ruled ■ against appellant. [Murphy v. King, 284 Ill. App. 74, 1 N. E. (2d) 268, l. c. 270 (2, 3).]

■ Appellant assailed plaintiff's instruction number one on two grounds. The first is, that the instruction ignored the defense made

that the defendant was forced to turn his automobile to the left to avoid a collision, or in other words that the defendant acted under an emergency and therefore was not liable to the plaintiff in damages. Appellant testified that he slowed down and turned to the left when the Behan car approached because the Behan car swerved to the wrong side of the road; that when he did so the Behan car again turned and struck his car. Plaintiff's instruction made no reference to this defense. Was it necessary to do so? We think not. Plaintiff's theory of recovery, as outlined in his instruction, was, that defendant was guilty of willful and wanton misconduct. If the jury so believed, then the jury of necessity must have disbelieved appellant's evidence. Appellant cites the case of Cantwell v. Cremins, 347 Mo. 836, 149 S. W. (2d) 343, and other cases. A reference to the Cantwell case will disclose that it is not in point. In that case the plaintiff charged the defendant with a violation of a statute with reference to the rules of the road, in that he drove his car to the left of the center of the roadway. There was no charge made, nor did the instructions in that case require the jury to find, that the act of negligence was willful and wanton. Such an issue was not in that case. Predicating a recovery upon the mere fact that a defendant was driving his car on the wrong side of the road is vastly different than a case where a recovery is based upon willful and wanton misconduct. A driver may in some circumstances drive his car on the left side of the center of the roadway and not be negligent. For example, if he acts in an emergncy (not of his own creation) to avoid a collision. In such a case his actions are not willful and wanton misconduct. Plaintiff's instructions required the jury to find, before a verdict for plaintiff was authorized, that the actions of the defendant constituted willful and wanton misconduct. Instructions given on behalf of the defendant emphasized this point. We therefore hold that the instruction was not subject to the criticism made.

The second complaint made of the instruction is, that it was broader than the pleadings in that the petition charged a violation of the speed statute and the instruction submitted common law speed. Appellant is correct in his position that a violation of a statute was pleaded and the instruction submitted the question of whether "the defendant operated his said automobile at a rate of speed which was excessive and dangerous under the circumstances . . ." However, appellant is in no position to complain of this. There was ample evidence that the defendant violated the statute, also ample evidence that the rate of speed at which he was driving was excessive and dangerous under the circumstances. The defendant offered evidence to the contrary and by his instructions submitted the case to the jury in the same manner as did plaintiff. Note that one of defendant's instructions read in part as follows:

"The court instructs the jury that if you find and believe from the evidence that the defendant operated his automobile at a reason-

able rate of speed on his own side of the road, if you so find, and that upon the first appearance of danger he slackened the speed . . ."

The conflicting theories of how the accident occurred, that of the plaintiff and that of the defendant, were fairly submitted by the instructions, resolving into a question of fact which the jury found against the defendant.

Appellant, at the trial, offered to read the deposition of Margaret Sigoletto and respondent objected, which objection was sustained by the trial court. This was assigned as error. The only reason given by appellant for offering the deposition was that plaintiff's counsel had admitted the witness was sick and therefore the deposition was admissible under section 1944, R. S. Mo. 1939. It was conceded that the witness was in the courtroom listening to the trial the day before her deposition was offered. No subpoena had been issued for her. The admission by appellant's counsel that she was sick, as contended for by appellant, amounted to nothing more than that counsel for plaintiff stated he had heard she was sick. Note the record:

"Mr. Hullverson: I said it was my understanding she was sick and is sick now. That is what I say now, and I have no way of verifying that, and I don't know whether that is true or not.

"The Court: You don't say it as a statement of fact?

"Mr. Hullverson: I don't say it as a statement of fact."

The trial court was not satisfied with the showing made and refused to permit appellant to read the deposition. Under the circumstances we are not authorized to disturb the ruling of the trial court. Whether a sufficient showing has been made in such a case rests largely within the discretion of the trial court. [18 C. J. 742, sec. 359.] We rule therefore that the trial court was justified in holding that appellant had not made a sufficient showing to render the deposition admissible. [See Collins v. Leahy, 344 Mo. 250, 125 S. W. (2d) 874, l. c. 879, 880 (1-3) (4).]

Appellant also asserts that the trial court erred in not permitting the defendant to comment upon the failure of plaintiff to produce·Margaret Sigoletto as a witness. The record disclosed that the trial court sustained a portion of respondent's objection to such comments, but the record further shows that counsel paid little if any heed to the court's ruling. It will not take any more space to embody herein just what occurred than to explain the matter in our own way. We therefore set out in full what occurred:

"Mr. Schwartz: . . . Now, to come into this, Miss Sigoletto has a suit here, I want to say before I touch on Mrs. Behan, I want to say this, if Miss Sigoletto—she is an adverse witness. Now, get this, you for the moment have given me, taken my side of the case while I am arguing this, and somebody has sued you. She is an adverse wit-

424

ness; she testified adversely before. She was in court here all day Tuesday—

"MR. HULLVERSON: Just a minute. I object to him making any comment or reference to her. The young lady was equally available to him, and also object to him stating what she said before.

"THE COURT: Sustained.

"MR. SCHWARTZ: I except."

. . . . .

"MR. SCHWARTZ (continuing): She is not equally available. I tried to find out where she lived and couldn't, and I said if she is sick I'll read her deposition. They could have read it. Gentlemen of the jury, there isn't anything worse to defeat justice, and it is so recognized by the courts, than to hide out a witness.

"MR. HULLVERSON: I object, if the Court please—

"THE COURT: Sustained.

"MR. HULLVERSON: I object to that and ask counsel be reprimanded for making any such statement.

"THE COURT: Sustained. .

"MR. SCHWARTZ: I except to any such ruling."

. . . . .

"MR. SCHWARTZ (continuing): I didn't know where she lived; that was evidence; and I said, 'Read her deposition if she is sick.' He could have done the same thing. So let him explain to you in his argument, if he will, why Miss Sigoletto, who was one of these persons sitting in the car with Laderman, and who has sued Laderman, and who was in court on Tuesday, did not take the stand for Wilbert Taylor. And I'll tell you the answer. The cross-examination of the deposition of her previously; that is why she didn't take the stand, but let him explain why she—

"MR. HULLVERSON: If the Court please, I submit this is highly unfair, inflammatory, and I ask the jury be instructed to disregard it, and ask counsel to be reprimanded for making a statement which is as unfair as that.

"THE COURT: All right, gentlemen, disregard the last statement of counsel. Objection be sustained. Stay within the record.

"MR. SCHWARTZ (continuing): If the lady was sick, then let me read the testimony—

"MR. HULLVERSON: I again object to him making these statements.

"THE COURT: Sustained."

It will be noted that the court did not sustain respondent's objection in full. It will also be noted that appellant's counsel commented on the failure to produce this witness at length. In view of such a record we rule that appellant has no right to complain.

The judgment is affirmed. *Bohling* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.