HAZEL T. BOYLE ET AL., Respondents, v. ROY W. CRIMM, Executor of the Estate of WILLIAM D. BOYLE, Deceased, Appellant, No. 42989 —253 S. W. (2d) 149.

Division One, December 8, 1952.

*Arthur C. Popham* and *Sam Mandell* for appellant; *Popham, Thompson, Popham, Mandell & Trusty* of counsel.

*Harry A. Hall* for respondent.

*Henry I. Eager* for defendant Occidental Life Insurance Company of California; *Blackmar, Newkirk, Eager, Swanson & Midgley* of counsel.

LOZIER, C.—Declaratory judgment action involving the proceeds of six life insurance policies in which John P. Boyle was the insured and of which William D. Boyle was the assignee. Plaintiff-respondent Hazel T. Boyle (herein called Mrs. Boyle) is John Boyle's widow. The other plaintiffs-respondents (herein called the Boyle children) are the sons of John Boyle and Mrs. Boyle. Defendant-appellant Roy W. Crimm (herein called Crimm) is the executor of the

estate of William Boyle. Defendant Occidental Life Insurance Company of California (herein called Occidental) is the insurer.

Occidental paid the proceeds of the policies, $23,746.90, into court. The trial court discharged Occidental, allowed Occidental a $500 attorney's fee, ordered that such fee and the costs be paid out of the deposited fund, entered judgments for Crimm for $12,861.54 and for plaintiffs-respondents for the balance of the fund. Crimm appealed.

The principal questions are: For whose benefit were the absolute-in-form assignments made? If the assignments were partially for security, what was the debt secured and is the assignee entitled to interest? Other issues involve the admission of evidence and the competency of witnesses.

We review this declaratory judgment case de novo upon the merits, giving due regard to the trial court's opportunity to judge the credibility of the witnesses. Sec. 510.310. (Unless otherwise indicated, all section references are to RS Mo 1949, and V.A.M.S.) As plaintiffs' action is essentially one to establish a resulting trust, we apply equitable principles and rules. Connell v. Jersey Realty & Investment Co., 352 Mo. 1122, 180 S. W. 2d 49, 54.

During 1924, 1926 and 1928, the Guaranty Life Insurance Company (herein called Guaranty) issued six policies, totaling $23,550, upon the life of John Boyle. Initially, in two instances, Mrs. Boyle was the sole beneficiary, but in one such instance, prior to the assignments, the Boyle children were made contingent beneficiaries. Mrs. Boyle was the principal beneficiary and the three children were contingent beneficiaries in the other policies. In all six policies, the insured reserved the right to change the beneficiary "if there be no existing assignment of this policy." Initially, the proceeds of all six policies were payable in a lump sum. In two instances, supplementary agreements or "settlement riders," dated February 10, 1928, were executed whereby the proceeds were to be paid to the beneficiaries in monthly installments for ten years.

In 1928 and 1929, William Boyle paid Guaranty $1461.80, annual premiums and interest on John Boyle's policy loans.

By documents dated June 1, 1930, John Boyle and Mrs. Boyle assigned the policies [152] to William Boyle, John Boyle's brother. The assignments, upon Guaranty's "Absolute Assignment of Policy" form, were as follows: "For value received, I do hereby assign, transfer, and set over absolutely unto William T. Boyle * * * all my right, title and interest in and to [the policy] with absolutely all privilege, benefit and advantage secured thereby, or to be had or derived therefrom, * * * hereby giving the said William D. Boyle * * * full power and authority to collect the proceeds thereof at maturity or to surrender the same for its cash value; and to give my receipt therefor which receipt I expressly agree shall be binding upon

my heirs, executors, administrators or assigns.'' After the assignments had been recorded in Guaranty's home office, the policies and assignments were delivered to William Boyle.

Occidental ''took over'' the policies in 1937. William Boyle died in 1938. The policies were listed as assets of his estate and thereafter his executor, Crimm, paid the annual premiums under an order of the probate court. John Boyle died in 1948.

After the assignments, John Boyle made no payments whatever. William Boyle made these payments: On September 30, 1930, $288.40, 1930 premiums delinquent on the date of the assignments; $5297.52, annual premiums; and, in 1936, $370.37, principal and interest on a John Boyle policy loan. After William Boyle's death, Crimm paid $7564.02, annual premiums. The William Boyle $5297.52 premium payments and Crimm $7564.02 premium payments totaled $12,861.54 (the amount of the judgment in Crimm's favor).

By deposition, Louis H. Burns testified as follows: He was Occidental's district agent and had been Guaranty's agent; he sold five of the policies and serviced all six; John Boyle had paid the premiums quarterly; he kept increasing his insurance and then couldn't pay the premiums and gave Burns an installment note and made a few payments on that note; before the assignments, William Boyle paid ''quite a few premiums'' and paid off some of John Boyle's policy loans; after the assignments, John Boyle paid no premiums. Burns ''handled all the assignments for the insurance company * * * acting as agent of the insurance company * * * which was interested in keeping these policies and not forfeited.'' Burns said he was ''interested in that, too, because of renewals.''

Burns said that the assignments were executed at the request of William Boyle. ''Q. Will you relate the circumstances leading up to these assignments? A. Well, Jack [John Boyle] couldn't pay the premiums. He asked me to get them from William Boyle, his employer, and I collected several premiums from him [William Boyle] and later I got a note from Jack Boyle for the balance of premiums, and then he couldn't—paid on a monthly basis the balance, and he couldn't pay this balance, and he asked me to see his employer, William Boyle, and I talked to Mr. [William] Boyle, and he said I shouldn't take notes from a man like Jack Boyle because he wasn't good for it. I told Mr. Boyle, 'This insurance is all in force. It would pay his family an income in case something happens to Jack Boyle, and if I were in your shoes, I would rather let the insurance company take care of that as you probably, I don't know, but you might feel obligated to help the family.' He said, 'I think you got me over a barrel, and I guess I better keep it up.' That is what William Boyle said. He paid them [the premiums] along for awhile. I called him one day, and he said, 'I want an assignment on these policies.' I said, 'Do you want a partial assignment or how do you

want it written up?' 'I want an absolute assignment,' he said I said, 'All right, Jack has paid some of the premiums.' 'Well,' he said, 'I want to keep these policies in force so that nobody can interfere with them and they will function as written on the settlement riders. I want to keep them in force that way.' * * * All he told me, he said, 'I talked to Jack and told him I wanted an assignment of the policies.' I don't know what he talked to him about. * * * Q. Now, as I understand you, then, William Boyle told you that he had talked with Jack and wanted an assignment of these policies? A. That is correct. [153] Q. To him? A. Yes. Q. Absolute assignments? A. That is correct. Q. So that he could keep them in force? A. And they would function as written as far as settlement riders, pay so much a month for Jack's family. * * * Q. Now, when the assignment [of the policy in which Mrs. Boyle was sole beneficiary] was discussed what was said, if anything, by Mr. William Boyle as to who that policy would be payable to? A. He didn't discuss that with me at all. He wanted an assignment on all the policies. Q. He wanted an assignment on all the policies? A. Right. * * * Q. Now, following that conversation with Mr. William D. Boyle, did you talk, go see Jack or John Boyle? A. Why, certainly. I had to go to see him to have him sign the assignments, he and his wife. Q. What was the substance of the conversation between you and them? A. I merely told Jack Boyle that William Boyle asked me to come over and have him sign the assignments and take up the policies and have them recorded. Q. Did you tell Jack what William had told you with reference to why he wanted the assignments?. A. I told him he wanted the assignments so that the policies would be protected and nobody could interfere with them and they would function as written. Jack said, 'I thought partial assignments would be all right.' I said, 'William wants absolute assignments.' That was the only conversation I had with him. Q. Now, you told him they would function as written? A. Yes. Q. Did you explain that or — A. No, I didn't explain it. * * * He signed all the settlement agreements. Q. Yes, and was anything said in the conversation about having the policies so that they couldn't be surrendered or borrowed on? A. That was the object of the assignment. I told Jack Boyle that. Q. Is that what William Boyle said? A. That is what William Boyle said. Q. And, did John Boyle and his wife agree to it? A. They both signed them. * * * Q. And, at the time John Boyle and his wife, Hazel Boyle, signed them state whether or not you had told them that Mr. Boyle, William Boyle, was going to maintain them in force if they executed these assignments. A. I didn't tell them that. I told them that he wanted the assignments so that the policies would be kept in force and function as written. That is what I said. Q. That is for the beneficiaries

named as originally written. A. That is right. Q. And, that was agreeable to them and they executed the assignments, is that right? A. They signed. I didn't know whether it was agreeable or not. I couldn't say to that."

Thereafter, Burns did not discuss premiums with John Boyle and "always collected from William Boyle who, from that time on, paid the premiums during his lifetime."

Upon cross-examination, Burns stated that his conversation with William Boyle concerning the assignments was had prior to the time Burns prepared the documents and took them to John Boyle; that he (Burns) had "nothing whatever to do with the policies after John Boyle's death or the claims on them." Upon redirect examination, Burns stated that in his discussion with William Boyle prior to the assignments, repayment to William Boyle for the premiums he would pay "wasn't discussed at all" and that no statements were made as to reduction in the amounts of the policies or in the payments to the beneficiaries.

Thomas H. Drummond, a nephew of the Boyle brothers, recalled hearing a conversation between his uncles during the fall of 1936. As Drummond remembered, his uncles were in the dining room and he (Drummond) and his mother were in the kitchen a few feet away. His uncles were talking, and "the subject came up about the insurance. * * * I listened all the while while Uncle John said about the policies; that he wanted to try and get the [154] thing straightened out. Uncle Will says, 'You don't have to worry about the policies, Jack.' He said, 'You know I don't want to make any money off of your insurance or take any of it away,' and then he went on to say, 'That insurance is for Hazel and the kids. You don't have to worry one thing in the world about it.' * * * Uncle John says, 'That is all right except supposing something would happen, is it understood the insurance goes to her?' That is as far as the question went and Uncle Will said, 'John,' — That there would be no trouble about that if anything should ever happen to him. * * * Q. Now, have you related all their conversation with reference to the insurance? A. That is as much as I heard about the insurance. They went on talking about these [business] books. That is all they mentioned. Q. When you say Uncle Will — You say Uncle Will told your Uncle John he didn't want to make anything out of his insurance? A. That's right. Q. And that insurance was for the benefit of Hazel and the kids? A. That's right."

Mrs. Marguerite Haus, a friend of the Boyle families, said she had heard insurance discussed quite often at the John Boyle home. She heard a conversation between the Boyle brothers one afternoon a year or eighteen months before William Boyle's death in June, 1938. She and Mrs. Boyle were seated on the John Boyle front porch when William Boyle and John Boyle came to the house. "And

in that particular conversation Bill Boyle was saying something about what was in his will that he had recently made out, and in the conversation there was something said by Jack, had he entered the insurance in his will that belonged to Jack. He said, 'No, it doesn't belong in there.' Q. Who said it didn't belong in there? A. Bill said, 'It doesn't belong in there.' He said, 'My only aim is to keep that insurance up so if something happened to you, it will go to Hazel and the boys,' meaning the three sons of Jack Boyle. There was a few other things discussed such as certain things he had entered in his will, but at that time that was just about all I heard them say.''

Without objection, Crimm put in evidence the petition in a suit filed by John Boyle against Crimm, as executor, in 1939 wherein John Boyle sought an accounting for a share of profits in one of William Boyle's enterprises during 1921-1927 and for salary during 1936 and 1937. The petition alleged that William Boyle had paid to or for John Boyle a number of items which the executor was entitled to offset against John Boyle's claim. Among such items were ''insurance premiums,'' $742.10 for each of the years 1930-38, inclusive. The suit was never tried and, on December 30, 1949, was dismissed for failure to revive after John Boyle's death.

Also without objection, Crimm put in evidence the original petition in the instant case (in which Mrs. Boyle was the sole plaintiff). That petition alleged that Crimm was ''entitled to be reimbursed for the approximately $12,500 premiums'' paid by William Boyle and his executor; and prayed that Crimm be required to prove the amount of the premiums paid and that the proceeds remaining, ''after refunding said premiums,'' be declared plaintiff's property. (Under the allegations and prayer of the amended petition, plaintiffs claimed the entire proceeds and asked a declaration that Crimm had ''no right, title, interest or claim in and to such policies and the proceeds thereof.'')

It was plaintiffs' theory that the assignments were made for the sole purpose of keeping the policies in force for plaintiffs' exclusive benefit and that Crimm had no interest whatsoever in the policies or their proceeds. Crimm's theory was that the assignments were for William Boyle's sole benefit and that he (Crimm) was entitled to the entire proceeds. The trial court found that the evidence sustained neither party's theory entirely; that the assignments were made for plaintiffs' benefit but that Crimm was entitled to reimbursement for certain payments made after the assignments, but without interest; and that plaintiffs were entitled to the excess over and above such payments.

Crimm asserts that Burns' deposition was improperly admitted ''because there was no proof of the existence of any condition authorizing its admission.'' However, the transcript shows

that both Crimm's counsel and the trial court accepted as true plaintiffs' counsel's statement that Burns was physically unable to be present at the trial. Note: "Mr. Hall [plaintiffs' counsel]: We offer in evidence the deposition of Louis H. Burns, taken June 19, 1948. Mr. Mandell [Crimm's counsel]: Just a moment. Mr. Hall, there is no showing of the unavailability of the witness, Mr. Burns. Mr. Hall: Mr. Burns, even prior to the time this deposition was taken, was seriously ill, and can't testify now. If you don't want to take my word for it, I will have to show it by a doctor's affidavit, but if you remember, the deposition had to be taken at Mr. Burns' home at his convenience, when he was able to be interviewed. Mr. Mandell: That was two or three years ago. Of course, we were not in the case at that time. I don't know anything about Mr. Burns' condition, today. Mr. Hall: I will say he is alive, but his condition is exactly the same. Do you remember now, Henry, of going with me? Mr. Eager [Occidental's counsel]: Mr. Hall, I couldn't be sure, but I seem to have a faint recollection that the deposition had to be taken out there and Clyde Taylor and I think Mr. Crimm went out. Mr. Hall. Mr. Crimm was there. His [Mr. Burns'] condition, I know, is serious enough that he can't leave his home. If you are going to object to the deposition on that account, then I will offer it subject to proof of his inability to be here." Crimm's counsel then objected to the admission of the deposition on other grounds. He neither renewed nor asked the court to rule his initial objection. The matter was never again referred to.

A deposition is admissible where the witness "by reason of age, sickness or bodily infirmity * * * be unable to or cannot safely attend court." Sec. 492.400. Here, the trial court and opposing counsel accepted the statements of plaintiffs' counsel, that Burns was physically unable to be present at the trial, as proof of that fact. "Under the circumstances we are not authorized to disturb the ruling of the trial court. Whether a sufficient showing has been made in such a case rests largely within the discretion of the trial court." Taylor v. Laderman, 349 Mo. 415, 161 S. W. 2d 253, 257 (counsel's statements in which case should be contrasted with the instant counsel's statements).

There is no merit in Crimm's contention that Burns was an incompetent witness because he testified (quoting from Crimm's brief) "that he had a personal interest, because of renewals, in keeping the policies alive." Burns was not disqualified by the "Dead Man's Statute," Sec. 491.010. He was neither "one of the original parties to the contract or cause of action in issue" nor the agent of such a party. Crimm cites Allen v. Jessup, (Mo.) 192 S. W. 720, 723-724, wherein the statute was held applicable to a witness, husband of a party, who in fact was a principal, the "real party in interest" in the transaction. Such is not the instant situation.

■ As did the trial court, in considering Burns' testimony, we have disregarded his conclusions and, where proper objection was made when the deposition was taken, his irresponsive answers and his answers to leading questions. Haddow v. St. Louis Public Service Co., (Mo. App.) 38 S. W. 2d 284, and Denny v. Guyton, 327 Mo. 1030, 40 S. W. 2d 562.

Nor was Burns', Drummond's and Mrs. Haus' testimony an attempt to vary the terms of the written assignments. "The majority of courts at the present time, however, are prone to look with reluctance upon absolute assignments and hold that if the assignment, though absolute in form, was intended only as collateral security, it will have only such effect. Thus, one having an equitable claim may show by parol that an apparently absolute assignment was intended as security, and such showing, whether demonstrated by written agreement or parol evidence, will be conclusive. And such evidence is admissible though contrary to the clear and unambiguous language of the assignment." 2 Appleman, Insurance Law & Practice, Sec. 1312, pp. 759-761. "And it has also [156] been held that the purpose of the written assignment may be shown by parol, although the assignment is absolute in terms." 2 Cooley's Briefs on Insurance, 2d Ed., p. 1839. "It is generally considered that parol evidence is admissible where it is offered, not for the purpose of varying the terms of a written contract or instrument, but for the purpose of explaining and showing the true nature and character of the transaction evidenced thereby * * *." 32 C.J.S., Evidence, Sec. 1015, p. 1037, citing Service Purchasing Co. v. Brennan, 226 Mo. App. 110, 42 S. W. 2d 39.

■ For whose benefit were these assignments made? We agree with the trial court, viz.: "I am convinced that if we take into consideration the relationship of the parties, all the facts and circumstances brought out in evidence touching the dealings of the two brothers, with the statement of William D. Boyle that he did not want to make any money out of John's insurance; that he wanted to keep the policies alive for the benefit of his wife and boys, together with the supporting testimony of witnesses Burns and Haus, no other reasonable conclusion can be reached but that the policies were assigned for the benefit of the plaintiffs in this case. I am convinced that the plaintiffs are entitled to recover the money deposited by the insurance company in the office of the clerk of this court after deducting therefrom the premiums paid on the insurance policies by William D. Boyle and his executor."

Prior to the assignments, William Boyle had made payments totaling $1461.80. He had chided Burns for taking his brother's note (for premium payments) because "a man like Jack Boyle isn't good for it." Apparently, William Boyle was prompted to demand the assignments when Burns asked him to pay the 1930 delinquent

premiums; he then realized that the policies would eventually lapse unless he paid the delinquent premiums and assumed the obligation of paying all subsequent premiums; that in all probability his brother would never reimburse him for payments he might thereafter make, and that his reimbursement would have to be made out of the proceeds of the policies; and that absolute assignments were necessary, both to prevent his brother from changing the beneficiaries or surrendering, or creating further liens against, the policies and also to secure the payments he (William Boyle) would thereafter make.

The evidence sustains these conclusions. When Burns suggested that, in the event of John Boyle's death, he (William Boyle) "might feel obligated to help the family," William Boyle said, "I think you got me over a barrel, and I guess I'd better keep it up." Later, he told Burns, "I want to keep these policies in force so that nobody can interfere with them and they will function as written on the settlement riders. I want to keep them in force that way." In 1936, William Boyle told his brother that "that insurance was for Hazel and the kids." In 1938 William Boyle told his brother that his "only aim was to keep that insurance up so if anything happened to you, it will go to Hazel and the boys."

One of the purposes of the absolute-in-form assignments was to deprive John Boyle of any rights he may have had to change the beneficiaries, secure further policy loans or surrender the policies. However, we do not believe that such was the sole purpose of the assignments. What did John Boyle mean when, in 1936, he told his brother that "he wanted to try and get the insurance *straightened out*"? In the John Boyle-Crimm suit, filed in 1939, John Boyle acknowledged that Crimm was entitled to offset the annual premiums William Boyle had paid for 1930-1938, both inclusive. From which we infer that John Boyle had, from the time of the assignments, recognized those premiums as an obligation secured by the assignments, payable from the proceeds of the policies. Mrs. Boyle's abandoned petition in the instant case acknowledged that Crimm was "entitled to reimbursement for the approximately $12,500 premiums" paid by William Boyle and his executor. (It will be recalled that Mrs. Boyle was present during the Burns-John Boyle conversation preceding the signing of the assignment documents by John Boyle and his wife.) We are persuaded that another purpose of the absolute-in-form assignments was to secure [157] William Boyle's subsequent payments. It follows that Crimm, the representative of the assignee-creditor, must account to plaintiffs for any amount of the proceeds in excess of the debt secured. Minnesota Mut. Life Ins. Co. v. Manthei, (Mo. App.) 189 S. W. 2d 144, 151[13].

And what was that debt? The record supports the inference that, prior to the assignments, the Boyle brothers had some sort of an understanding as to what payments were thereafter to be made by

each, respectively; also, for what payments, prior or subsequent, William Boyle was to be reimbursed and how and when he was to be reimbursed. Apparently, William Boyle was to make all subsequent payments and was to be reimbursed from the policies' proceeds. (After the assignments, John Boyle made no payments and reimbursed neither his brother nor his executor for any payments made by either.)

Unquestionably, John Boyle's debt included the $12,861.54 annual premiums for which Crimm had judgment. However, as we believe that the assignments were intended to secure all subsequent payments made by William Boyle, Crimm should also have credit for two such payments, totaling $649.12, not allowed by the trial court. The $288.40 item, delinquent 1930 premiums, would be allowable if the assignments secured only subsequent *premium* payments. But we believe .that the obligation secured included other than premium payments. In 1936, William Boyle also paid $370.37, principal and interest on a policy loan outstanding at the time of the assignments. He thus increased to that extent the value of both his own security and plaintiffs' interests in the proceeds. We see no distinction between subsequently-paid-premiums and subsequently-paid-prior-loan obligations.

Crimm also contends that he should also have credit for the $1461.80 premiums and policy loan obligations paid by William Boyle in 1928 and 1929. The record contains no evidence whatever from which it may be inferred that those pre-assignment payments were other than voluntary, were regarded as an antecedent indebtedness at the time of the assignments .or were to be secured by the assignments.

 , Is Crimm entitled to interest? An allowance of interest must be based upon either a statute or a contract, express or implied; and in equity such an allowance is generally a matter for the chancellor's discretion. 47 C.J.S., Interest, Secs. 3, 6, 7 and 8, pp. 13, 17, 19, 20; 30 Am. Jur., Interest, Sec. 4, p. 8. (See also 46 C.J.S., Insurance, Sec. 1180, p. 89, as to payment of premiums.) And, in the absence of an express agreement that the obligation shall bear interest, a contract to that effect will or will not be implied according to the circumstances. See 47 C.J.S., Interest, Sec. 8, p. 20; 30 Am. Jur., Interest, Sec. 5, p. 9.

Sec. 408.020 allows creditors six percent interest ''when no other rate is agreed upon, for all moneys *after they become due and payable*, on written contracts.'' Crimm argues that the assignments were ''not only acknowledgments of money due and to become due but also written contracts or orders for the payment of money due and to become due, granting an unequivocal right in William D. Boyle to surrender them for their cash value without the necessity of calling upon assignors or either of them to perform any single additional act to empower him so to do; * * * with each additional payment

there was an automatic acknowledgment that payment thereof was due to him with the right to immediately cash in the policies and obtain the total of such additional premium payments at any time he elected to do so; * * * the premium payments made by William Boyle under the theory of the trial court's judgment were due and payable to him the very instant he made such payments."

If the assignments were "contracts or orders for the payment of money" (a matter which we can assume without deciding), payment was to be made only out of a specified fund and only at a certain time. Under the express terms of the assignments, William Boyle was entitled "to *collect* the proceeds * * * at *maturity* or" to surrender the policies for their cash value. Neither William Boyle nor his executor exercised the right to surrender the policies and thereby cause any money to become "due and payable" before John Boyle died. Under such circumstances, reimbursement [158] to William Boyle was to be made only out of the proceeds upon maturity of the policies, i.e., upon John Boyle's death. As such reimbursement was not "due and payable" until John Boyle died, the above-quoted provisions of Sec. 408.020 are inapplicable.

There was no evidence of an express agreement that William Boyle's payments were to bear interest. And a contract to that effect cannot be implied from the circumstances. For example, consider in the light of all the other circumstances William Boyle's statement to his brother, "I don't want to make any money off of your insurance." So considered, that statement, in our opinion, not only negatives an express agreement that the payments were to bear interest, but furnishes no basis from which such an agreement can be implied. The entire circumstances indicate that all William Boyle expected reimbursement for (and that all John Boyle expected him to be reimbursed for) was his subsequent payments, and no more. The circumstances certainly do not justify the allowance of interest as a matter of discretion. We hold that Crimm is not entitled to interest.

Crimm cites these cases in which interest was allowed upon payments made by either the assignee or the beneficiary. Schneider v. Kohler, (Mo.App.) 201 S. W. 2d 499; Sage v. Finney, 156 Mo. App. 30, 135 S. W. 996; Strode v. Meyer Bros. Drug Co., 101 Mo. App. 627, 74 S. W. 379. These cases are inapplicable in that they involved circumstances quite different from the instant circumstances.

The judgment should be, and hereby is, modified to allow Crimm the $649.12 for the two items heretofore discussed, and thereby increase the amount of the judgment in his favor to $13,510.66. As thus modified, the judgment is affirmed. *Van Osdol* and *Coil, CC.,* concur.

PER CURIAM:—The foregoing opinion by Lozier, C., is adopted as the opinion of the court. All the judges concur.