**Robert E. MILLARD (Plaintiff), Respondent,**

v.

**ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation (Defendant), Appellant.**

No. 30343.

St. Louis Court of Appeals.

Missouri.

Dec. 15, 1959.

Motion for Rehearing or to Transfer to Supreme Court Denied Jan. 12, 1960.

Vincent James Ruddy, St. Louis, for appellant.

James E. Hullverson, Barney J. Gissenaas, Hullverson, Richardson & Hullverson, St. Louis, for respondent.

ANDERSON, Judge.

This is an action by plaintiff to recover damages for personal injuries sustained by him in a collision between an automobile which he was driving and a streetcar owned and operated by the defendant. The trial below resulted in a verdict and judgment for plaintiff in the sum of $7,500. From the judgment, defendant has appealed.

The collision occurred on February 6, 1958, at the intersection of Cherokee Street and Grand Avenue in the City of St. Louis. Grand Avenue is a north-south street and, according to plaintiff's testimony, 40 or 50 feet wide. It has six lanes for traffic, including a parking lane. A double set of streetcar tracks are located in the center of

Grand Avenue. The east tracks are for northbound streetcars, and the west tracks are for southbound streetcars. According to plaintiff's evidence, Cherokee Street is 30 to 35 feet wide and runs in an east-west direction. It forms a "T" type intersection with the east side of Grand Avenue. The accident occurred within this intersection when defendant's southbound streetcar struck the rear of plaintiff's automobile which had been proceeding south on Grand Avenue, and which at the time of the collision was stopped preparatory to making a left turn east into Cherokee Street.

The first intersecting street north of the intersection in question is McDonald Avenue. It forms a "T" intersection with the west side of Grand Avenue. There is a Cities Service filling station located on the southwest corner of McDonald and Grand Avenues. The width of the frontage of this service station on Grand Avenue is, according to plaintiff's evidence, about 60 feet. There are two driveways into the filling station from Grand Avenue. Plaintiff estimated the distance between the north curb of Cherokee back to the alley on the east side of Grand, opposite the south curb of McDonald, to be 130 feet. The defendant's motorman estimated the distance from the south curb of McDonald to the north curb of Cherokee to be about 90 feet. Defendant's Exhibit "A" shows the alley on the east to be directly opposite the south curb of McDonald. The collision occurred about 3 o'clock in the afternoon. The weather was clear and the streets were dry at the time.

Plaintiff testified that he got onto Grand Avenue two blocks north of Cherokee. He entered Grand Avenue from the west and turned south. Before entering Grand Avenue plaintiff looked to see the condition of southbound traffic. He did not recall seeing the streetcar at the time, but checked to see whether the traffic was a sufficient distance away to make a safe turn. He noticed that the way was clear. After his turn south into Grand Avenue plaintiff proceeded in

the traffic lane immediately to the right of the southbound streetcar tracks and continued south in this lane for about a half block, then turned onto the streetcar tracks —his reason for this being that he intended to make a left turn into Cherokee Street. Before proceeding onto the streetcar tracks plaintiff again checked in his rear vision mirror to see if there was traffic behind him which would interfere with his ability to change lanes. Plaintiff stated that the nearest traffic to him at the time he looked was about a half block; that he did not recall seeing any special type of vehicle, or specifically seeing the streetcar; that he checked to make sure nothing was right behind him to prevent his changing lanes, and that he thought it was safe enough to make the change. The change over was not abrupt, but made in a distance of three or four car lengths. While making this change over plaintiff did not hear any sound or warning as would be made by a streetcar. Plaintiff's speed while approaching Cherokee was about 15 or 20 miles per hour, except when he changed lanes, at which time his speed was a bit faster. As plaintiff approached Cherokee Street he turned on the left turn indicator of his automobile and stated he knew the indicator was in good working order at the time because he heard a clicking sound when it was turned on and observed the light flashing on the dashboard. When plaintiff reached McDonald Avenue he applied the brakes, and then brought his car to a gradual stop, with its front end in the center of the intersection of Grand and Cherokee. His automobile was facing south and slightly to the east, with the front wheels turned slightly to the left in order to make the turn as quickly as possible. With his car in this position, plaintiff waited for northbound traffic to clear. After remaining in this position for about twenty seconds plaintiff's automobile was violently struck from the rear by defendant's streetcar. After the impact, plaintiff's automobile came to rest headed east on Cherokee, about a car's length from Grand Avenue. Plaintiff testified he never-

saw the streetcar prior to the collision, but that a split second before the impact he heard a gong sounded immediately behind him.

Raymond Temple, the operator of the streetcar, testified for the defendant. He stated that when he first saw plaintiff's car it was coming out of the south driveway of the filling station onto Grand Avenue. The speed of plaintiff's automobile was then about ten miles per hour and the streetcar was between 35 and 45 feet north of the driveway. The streetcar had already passed the south curb of McDonald Avenue and was traveling at a speed of twenty to twenty-five miles per hour. After emerging from the driveway plaintiff turned south on Grand Avenue into the curb lane, and gradually accelerated the speed of the automobile. The operator of the streetcar testified that when he first saw plaintiff's automobile he sounded the gong on his streetcar. Plaintiff traveled toward Cherokee in the curb lane about 60 or 70 feet, then cut over rather sharply onto the streetcar tracks. Temple stated that plaintiff was about 20 or 25 feet from Cherokee when he cut over and was slowing down the speed of his automobile at the time. The front end of the streetcar was then 30 to 35 feet from the rear end of plaintiff's automobile. The streetcar was traveling about 20 miles per hour. Temple further testified that, under the existing conditions, the shortest distance within which the streetcar could have been stopped was 80 feet. When plaintiff cut over onto the tracks Temple saw the blinker light and brake light on plaintiff's automobile. Temple stated that he immediately applied the brakes in an attempt to make an emergency stop. The automobile was brought to a stop in the center of Cherokee and on the tracks in front of the moving streetcar in a space of 30 feet. The automobile was facing southeast. The streetcar, its speed at that time being 3 to 5 miles per hour, then ran into the rear of the automobile.

Audrey Pigg, a passenger on the streetcar, testified that in the block prior to the collision the streetcar was traveling 20 or 25 miles per hour.

Instruction No. 1, given at plaintiff's request, submitted the case upon the charge that defendant negligently overtook plaintiff's automobile and collided with it from the rear. Said instruction was as follows:

"The Court instructs the jury that if you find from the evidence that on the occasion mentioned in the evidence Mr. Millard's automobile was stopped and standing still at the place mentioned in the evidence, and that after he had been stopped there for five seconds or more, if you so find, his automobile was overtaken and struck from the rear, while it was stopped, by one of defendant Streetcar Company's streetcars, and that in permitting the streetcar to strike Mr. Millard's automobile the driver of defendant's streetcar failed to exercise ordinary care and was negligent, and that plaintiff was injured as a direct result thereof, then the Court instructs you that Mr. Millard is entitled to recover and your verdict must be in his favor and against defendant."

Appellant complains the instruction is erroneous for the reason that there was no evidence indicating the streetcar could have been stopped short of the point of impact within a five second interval. Specifically, it is urged there was no evidence to show the distance which separated the two vehicles at the time; no evidence of the speed of the streetcar; and no evidence of the distance in which the streetcar could have been stopped. Plaintiff offered no evidence on these matters. However, defendant offered evidence that in the block prior to the collision the streetcar was traveling 20 or 25 miles per hour. There was evidence from which the jury could have found that the distance from the north curb of Cherokee Street to the south

curb of McDonald Avenue was 130 feet. Plaintiff's car was stopped in the center of Cherokee, beyond its north curb. A streetcar going 20 miles per hour would travel 29 feet per second; in five seconds it would travel 145 feet. The operator of the streetcar testified that, under the then existing conditions, the streetcar could have been stopped in 80 feet. The foregoing evidence was available to plaintiff in support of the charge submitted by Instruction No. 1, since the facts shown were favorable to him and were not contradicted by his own testimony or contradictory to the fundamental theory of his case. Smithers v. Barker, 341 Mo. 1017, 111 S. W.2d 47.

■ Appellant's next objection to the instruction is that it assumes that defendant's operator permitted the streetcar to strike plaintiff's automobile. In support of this contention appellant argues that the term "permit" implies knowledge and consent, and the existence of the means to prevent the collision, and for that reason the instruction, in effect, charged defendant guilty of negligence as a matter of law.

It would have been more consonant with proper practice for the court to have avoided any seeming assumption of a controverted fact by so framing the instruction as to leave no doubt that, under the law, it was necessary for the jury to find that the defendant's driver did, in fact, permit the streetcar to strike the automobile through some negligent act or negligent failure to act. But viewing this instruction in connection with the other instructions given, and looking to the evidence, we are unable to see how the jury could have been misled by the technical vice of the instruction. The instruction does require the jury to find that the operator failed to exercise ordinary care and was negligent. From this, the jury must have understood that a finding of some negligent act of commission or omission was necessary before a verdict for plain-tiff was authorized, and that any conclusion they might reach on this issue should be found from a consideration of the evidence presented.

There was evidence pro and con on the issue of negligence. The evidence of plaintiff tended to show negligent failure of the operator to take necessary precautions to avert the accident when danger of collision became apparent. On the contrary, the evidence of defendant tended to show that when the danger of collision did become apparent it was too late for the operator of the streetcar to take effective steps to avoid the accident.

Defendant fully presented its theory of the case in Instruction No. 2. By said instruction defendant hypothesized facts with reference to the movement of the two vehicles as testified to by the operator, then charged: if the jury found that at the time plaintiff turned to his left to go upon the streetcar tracks, "it was then too late for the operator in the time and space available and in the exercise of ordinary care, with the means and appliances at hand, to have brought said streetcar to a stop in time to have avoided the collision," the plaintiff was not entitled to recover. The issue of plaintiff's alleged contributory negligence, in suddenly turning onto the streetcar tracks and making a sudden and abrupt stop without giving a reasonable and adequate warning, was submitted by defendant in Instruction No. 3.

■ That Instruction No. 1 is subject to criticism cannot be questioned, but in view of the evidence, and the instructions read as a whole, the conclusion must be that the jury was not misled as to the issues. See Luechtefeld v. Marglous, Mo. App., 176 S.W.2d 674, loc. cit. 682, and cases therein cited. To authorize a reversal of a judgment for error in obtaining it, the appellate court must be satisfied that the error complained of materially affected the merits of the action. RSMo

1949, § 512.160, subd. 2, V.A.M.S.; Luech-tefeld v. Marglous, supra.

Defendant claims error in the giving, at plaintiff's request, of Instruction No. 5, which authorized a recovery under the humanitarian doctrine predicated on failure to stop after plaintiff came into a position of peril. In support of this assignment it is urged there was no evidence in plaintiff's case to establish the point where plaintiff entered a position of peril; nor evidence of the necessary stopping distance of the streetcar. Defendant says that plaintiff cannot aid his case by defendant's testimony that the streetcar was traveling 20 miles per hour as it approached Cherokee Street, or the evidence that it could, traveling at 20 miles per hour, be stopped in 80 feet—for the reason that such testimony was at war with plaintiff's theory of the case.

■ As we have heretofore stated, plaintiff offered no testimony with reference to speed of the streetcar, or the necessary stopping distance. In such a case, he may have the benefit of evidence favorable to him with reference to these matters developed by defendant, if not contradictory to the fundamental theory of his case. Smithers v. Barker, 341 Mo. 1017, 111 S.W.2d 47. We fail to see how it can be said that defendant's evidence as to the speed of the streetcar and the necessary stopping distance was at war with plaintiff's theory of recovery. It does not dispute any testimony given by plaintiff, or in any way tend to disprove any of the ultimate facts embraced in plaintiff's theory of liability.

■ The plaintiff's evidence shows that he stopped his automobile on the streetcar tracks in the center of Cherokee, and remained in that position for 20 seconds waiting for northbound traffic to clear so that he could make a left turn into Cherokee Street. There was evidence of a disinterested witness that there was, in fact, northbound traffic at the time. The left turn signal on plaintiff's automobile was operating during the entire time plaintiff was stopped. All this was visible to defendant's operator as he approached the intersection. According to defendant's evidence, the streetcar was traveling 20 miles per hour as it approached the intersection. At that speed the streetcar traveled approximately 580 feet during the 20 seconds plaintiff's automobile was stopped on the tracks. The streetcar could be stopped in 80 feet. We believe the evidence ample to support the submission of the humanitarian doctrine.

During the course of the cross-examination of plaintiff, counsel for defendant inquired of plaintiff if he had not previously made certain statements to defendant's adjuster with reference to previous accidents and injuries. In conducting this examination defendant's counsel read from a paper which purportedly was a signed statement of plaintiff. Other accidents were admitted by plaintiff but he denied having received injuries as a result thereof. During this cross-examination plaintiff's counsel reached across the counsel table and took hold of the statement, whereupon counsel for defendant snatched the paper out of his hands. Plaintiff's counsel then, within the hearing of the jury, stated he thought he had a right to see the statement. Defendant's counsel then asked for a mistrial on account of "the improper actions of plaintiff's counsel making a demand on defendant's counsel to produce a certain document." This request was denied. Counsel for defendant then asked that the jury be instructed that "this tactic on the part of plaintiff's counsel is totally improper." This request was likewise denied. Notwithstanding the fact that the court had ruled, defendant's counsel again requested that the court instruct the jury that "this is highly improper action on the part of plaintiff's counsel." The court again denied the request, whereupon counsel for plaintiff stated: "I would like to ask the court to direct Mr. Green to allow me to read the piece of

paper which he used to cross-examine the plaintiff." To this, the court replied: "If Mr. Green will consent to give it to you—otherwise I won't allow it." Counsel for defendant again moved for a mistrial, which motion was by the court overruled. Counsel for plaintiff then stated: "I object to counsel's statement that it was improper. It's the first time I have ever seen anybody cross-examine somebody with a piece of paper and then hide the paper." Defense counsel then asked for a mistrial on the ground that the remarks of plaintiff's counsel were improper; and also moved that the court instruct the jury to disregard the remarks. Both motions were overruled. Defendant's counsel then offered the statement in evidence, stating: "The only reason I am going to read it into evidence is since the court did not declare a mistrial, and didn't instruct the jury his demand was improper in the first place, I now have a right to rehabilitate the position of the defense in the eyes of this jury."

Defendant here contends that the trial court erred in not declaring a mistrial and in refusing to instruct the jury as requested.

■■ Whether a mistrial should have been declared under such circumstances rests within the sound discretion of the trial court. Higgins v. Terminal R. Ass'n of St. Louis, 362 Mo. 264, 241 S.W.2d 380. We do not believe the trial court's ruling was a manifest abuse of that discretion. The trial court was in a good position to measure the tenor and effect of the incident. He overruled the motion after careful consideration. The matter was again specifically brought to his attention in defendant's motion for new trial, and it must be assumed that before the trial judge ruled on the motion he considered the effect of the incident on the minds of the jurors and on the outcome of the trial. We feel no error was committed with respect to the court's ruling on this motion.

■■ Nor can we say that prejudicial error was committed in refusing to instruct the jury that the conduct of plaintiff's counsel was improper. A reprimand might have been in order, or perhaps a direction to the jury to disregard the conduct and remarks of counsel. But failure to so instruct or to comply with defendant's request was not, in our view, reversible error. It is difficult to believe that prejudice resulted to defendant from this incident. We are precluded from reversing a judgment unless we believe that error was committed against appellant materially affecting the merits of the action. Section 512.160 RSMo 1949, V. A.M.S.; Mueller v. Schien, 352 Mo. 180, 176 S.W.2d 449; Roush v. Alkire Truck Lines, Inc., Mo.Sup., 245 S.W.2d 8.

■ The cross-examination of plaintiff was interrupted on three occasions in order that plaintiff's doctors might testify. On each occasion, defendant's counsel interposed an objection which the court overruled. The matter is now urged as grounds for reversal. It is said that such action of the trial court took away the continuity and effectiveness of the cross-examination, and prevented the defense counsel the right to lay a proper foundation for cross-examination of said medical witnesses. Defendant admits that the order of proof rests within the sound discretion of the trial court, but contends there was an abuse of discretion in this case.

■ Suffice it to say, that after a careful and painstaking examination of plaintiff's cross-examination, which covers approximately 93 pages of the transcript, we fail to see where defendant was prejudiced in any manner by reason of the break in the continuity of its cross-examination of plaintiff. We have also examined the testimony of plaintiff's doctors and are convinced that defendant's counsel was not hampered in the least by being deprived of his right to fully cross-examine plaintiff before cross-examining said doctors. Appellant is not claiming excessiveness of

the verdict. Therefore, if the ruling of the court was error, it was harmless. Anderson v. Bell, Mo.Sup., 303 S.W.2d 93. We find no abuse of discretion.

Dr. Walter T. Gunn testified that on plaintiff's first visit to his office plaintiff complained of pain in the region of the neck, and limitation of motion of the head. Dr. Gunn stated he found a muscle spasm in the neck, which indicated traumatic injury, and for the relief of this condition he prescribed the use of a "Thomas" collar. At a subsequent visit the doctor found the muscle spasm still present but lessened, and also some limitation of motion of the head. The doctor advised plaintiff to wear the "Thomas" collar for another week. At the end of the week there was still muscle spasm and the limitation of motion. Plaintiff at that time also complained of a "crunching" in the neck. Upon examination the doctor could feel this "crunching," which he described as one of the vertebrae riding over an object of some sort. This object could either be a solid blood clot or scar tissue. X-rays which the doctor had taken ruled out the possibility of a minute fracture.

X-rays of plaintiff's neck, and X-ray reports contained in the plaintiff's file at the City Hospital, were brought into court by the Clerk of the Medical Record Department of the City Hospital. They were not formally introduced in evidence, but during the direct examination of plaintiff the following question was put to the witness: "Q. * * * at the City Hospital they took an X-ray, of which this diagnosis is made * * * ' "Robert Millard, date 2/6/58. Examination of the cervical spine in the A. P., lateral, and open-mouth views, reveals loss of the normal lordotic curvature of cervical spine. Intervertebral spaces of average width. No evidence of fracture or discoloration." ' Doctor, of what significance is it to you that there is a loss of the normal lordotic curve?"

Defendant's counsel objected to the question on the ground that the witness had not testified he found such a loss of the normal lordotic curvature, and on the further ground that the question called for an opinion based on the opinion of the doctor who made the original X-ray report. The objection was sustained. Counsel for plaintiff then asked the following question: "Q. The evidence has shown the original X-rays taken at the City Hospital showed a loss of the normal lordotic curve. Is there any connection, in your opinion, between that and muscle spasm?" Defendant's counsel objected to this question on the same ground as he objected to the previous question. The court overruled this objection. The witness answered: "A. It's one of the most frequent findings in this type of injury. It can only happen if there is a tearing of the ligaments and tearing of the tendons so the normal vertebrae is out of alignment. * * *

"Q. Would that finding be consistent with your own finding of muscle spasm? A. Yes, sir."

Appellant here complains of the admission of this evidence, urging the same grounds of objection as made below. Respondent contends that the testimony which explained a connection between Dr. Gunn's diagnosis and that contained in the hospital report was proper.

We need not determine whether the trial court erred in its ruling, for the reason appellant does not rely on the point that the verdict is excessive. The testimony admitted could have affected the issue of damages only, and any error in the court's ruling was harmless. Anderson v. Bell, Mo.Sup., 303 S.W.2d 93.

Dr. Gunn, during the course of his testimony both on direct-examination and cross-examination, made reference to a set of X-rays which he had made of plaintiff's

## 156

neck at St. Anthony's Hospital. During cross-examination defendant's counsel questioned the doctor with reference to the "crunching" which plaintiff suffered when his neck was moved. As heretofore stated, Dr. Gunn had testified that this "crunching" could result from either a blood clot, scar tissue of torn ligaments, or a "lipping" of the cervical vertebrae, as shown in the St. Anthony's X-ray report. Asked to indicate the "lipping" on the X-rays, the witness stated that he would rather have an X-ray man do that; that he did not ordinarily interpret X-rays; and did not consider himself an expert in the interpretation of X-rays. The court sustained an objection to the doctor interpreting the X-rays, saying: "It's an attempt to put one doctor against another doctor's word." Defendant's counsel then objected to the court's remark, and moved for a mistrial. There was a further objection to the court's refusal to permit defendant to examine the doctor with reference to his X-ray·findings. The court overruled the motion for a mistrial.

Appellant contends that the court's remark amounted to an improper comment on the evidence; that it, in effect, advised the jury that the testimony of Dr. Gunn was unimpeachable. Here again, we need not notice the point urged, since the matter could only have affected the issue of damages. Anderson v. Bell, supra. We make the same ruling with respect to the assignment that the court erred in refusing defendant's counsel permission to cross-examine the doctor with reference to his ability to interpret the X-rays in question.

Finding no reversible error in the record, the judgment is affirmed.

WOLFE, P. J., concurs.

RUDDY, J., not sitting.