**Earl KAGAN, Plaintiff-Respondent,**

**v.**

**ST. LOUIS PUBLIC SERVICE COMPANY, a corporation, Defendant-Appellant.**

No. 30829.

St. Louis Court of Appeals.

Missouri.

Sept. 18, 1962.

Donald L. Schmidt, St. Louis, William M. Corrigan, St. Louis, of counsel, for appellant.

Orville Richardson, Louis Gilden, Hullverson, Richardson & Hullverson, St. Louis, Corinne Richardson, St. Louis, of counsel, for respondent.

BRADY, Commissioner.

This is an action for damages arising out of personal injuries the respondent allegedly sustained when his automobile was struck from the rear by defendant's streetcar. Trial terminated in a jury verdict in favor of respondent in the amount of $4,000.00. The trial court overruled appellant's timely after trial motions and it has perfected this appeal. This is the second appearance of this case before this court, the first trial resulting in a $3,500.00 verdict for the respondent. Upon appeal from that judgment, this court reversed the judgment and remanded the cause, Kagan v. St. Louis Public Service Company, Mo. App., 334 S.W.2d 379.

The essential facts of the occurrence are stated in the earlier opinion in this case and, since in this trial the respondent received the jury verdict and also

because the appellant contends the trial court erred in denying its motions for a directed verdict, the evidence will be reviewed in the light most favorable to the respondent, giving him the benefit of all reasonable inferences to be drawn therefrom and confining ourselves to the issues submitted, Thaller v. Skinner & Kennedy Company, Mo.App., 307 S.W.2d 734, transf. Mo., 315 S.W.2d 124; La Tour v. Pevely Dairy Company, Mo.App., 349 S.W.2d 436. Those facts, as amplified by the testimony given at this trial, are that the respondent, driving eastwardly on Olive Street in the City of St. Louis, stopped at a traffic signal at the intersection of Olive Street and Compton Avenue. Respondent had been stopped there for fifteen or twenty seconds when the streetcar hit his automobile from the rear. The force of the impact sent respondent's automobile forward so that the front end of it was about halfway into Compton. The streetcar came to a stop where his car had been. The impact damaged the trunk lid of his car, "crashed in" the trunk, and the bumper was "pushed in a little." The license plate and trunk lid hasp were pushed in "somewhere between two and four inches." At the scene a Mr. Christie came up to respondent and identified himself. The balance of his testimony on direct and on cross-examination dealt with his injuries, visits to various doctors, and other similar matters which will be discussed in connection with the appellant's allegations of error dealing with the excessiveness of the verdict and the giving of the measure of damage instruction.

The eyewitness, Mr. Christie, testified that on the date and at the time of the occurrence in evidence he was on his way to the downtown office of his employer, the National Cash Register Company, and was awaiting public transportation facilities at the Olive Street and Compton intersection; that he was standing in the safety zone awaiting the arrival of the eastbound streetcar and was about three feet to the rear of the respondent's car which was stopped on the tracks; that " * * *

About the time the car would be approaching the left end of the safety zone, I heard quite a sound and noticed that the streetcar, coming at apparently a normal rate of speed, on entering the zone was making a clamoring sound, the bell was ringing, and it seemed to me there was a lot of metal clanging. What the noise was, I can't say; it was unusual. Realizing that the car could not possibly stop until contact was made with the parked car, I immediately tried to get as far as possible away from the automobile." The witness further testified that the impact pushed the car forward to the center of the intersection, that the streetcar's speed did not decrease before the impact; that when he looked toward the streetcar he " * * * noticed that, from the appearance of the motorman's face, or the operator of the car's face, that he was doing everything humanly possible to stop the car." This concluded the respondent's evidence concerning the happening of the collision.

The appellant's evidence concerning the happening of the collision was given by one Anthony Hollerbach, who testified he was superintendent of railway maintenance for the appellant and has been engaged in this general field for thirty-nine years; that there is a difference in the braking of automobiles when compared to streetcars which he attributed to the fact that steel wheels on steel rails do not have the "road adhesion" that auto tires have to a road; that streetcars will occasionally slide on rails even with their brakes applied due to leaves being on the rails, "rail sweat" caused by changes in temperature, or oil and grease droppings on the rails; and that an operator of a streetcar has an eye level five to six feet above the level of the street and cannot normally see whether or not there is oil or grease on the tracks. On cross-examination this witness testified that because streetcars are harder to stop, one has to "start stopping them sooner" and pay more attention to what he is doing.

Mr. Fred H. Kassel, testified for the appellant that he was a process server and was employed by the appellant to serve a subpoena on one Conrad Schleuter, the operator of the streetcar, and that appellant gave him an address of 5598 Waterman. His testimony of his efforts to find Schleuter is as follows:

" * * * When I went to that address and checked the mailboxes, there was no Conrad Schleuter listed there, but alongside of the mailbox there was a 'phone number to call in case of renting the apartment. So, when I checked the apartment before I left, there was no answer. When I returned to my office I called the 'phone number and talked to the woman who answered, and she had no recollection of any Mr. Conrad Schleuter living at that address.

"Then I consulted the City Directory and found an address at 5011½ Lotus. I went to that address, I think the following day, and found no Mr. Schleuter at that address and could get no information of anyone by that name living there.

"Then from the Public Service Company I received information to try the Windemere Hotel which is located on Clara and Delmar. On going out there one evening, I talked to the man behind the desk, the clerk, and he checked their records and found that Mr. Schleuter had been there January 29, 1960, for approximately two weeks, which would bring it up into February sometime, and he had left there and there was no forwarding address. And this was as far as I could go on it."

On cross-examination, Kassel testified that he had been serving subpoenas since "about 1935"; that he does all of that type of work for the appellant; that he was not told how long Schleuter had worked for the company, neither was he given access to the employment records of the company, nor was he told the social security number of this person, nor whether or not he belonged to a union; that he did not use any

of the private firms who locate people in the City of St. Louis although he knew of the existence of such firms; that when he went to the Waterman address he found it was an apartment house; that he did not ask anyone who lived there where Schleuter was; that when he talked to the manager he did not ask how long she had been manager, or who the owner of the building was, or who collected the rent for the apartments; that the Lotus address came from a 1959 City Directory published by Polk Directory; that he did not contact the Polk firm to see if they had a current address on Schleuter; that this address has apartments above street level stores; that he did not ask any of the people there whether they knew Schleuter; that he did not try to find the owner of the building on Lotus to ascertain if that person had any addresses of former residents; that he made no attempt to contact other people named Schleuter to determine if they were related to this man; that he received the subpoena on the 6th or 7th of October; that it provided for Schleuter's appearance on October 17th; that he did not make any return on the subpoena; that the subpoena he was given was not issued by the Clerk of the Circuit Court but by a notary public; that he did not have the subpoena, having "probably" destroyed it, and so did not file it in the records in the case.

At the conclusion of the testimony by this witness, appellant's counsel stated, " * * * I would like to read the testimony of Conrad Schleuter which was given under oath in a trial of this lawsuit which began on February 19, 1959." Respondent's counsel objected, out of the hearing of the jury, on the ground that "due diligence" had not been shown. The trial court sustained the objection. Following a recess, the appellant offered the witness Goeglein who testified that he was superintendent of employment for appellant; that Conrad Schleuter had been an employee of appellant, beginning work on October 1, 1951 and ending on March 24, 1960; and that he gave his address as the Windemere Hotel. Again out of the hearing of the jury, the following occurred:

"MR. SCHMIDT: At this time, Your Honor, I again renew the fact that I do wish to read into evidence the testimony of Mr. Conrad Schleuter given at the first trial of this case. We have made every effort to locate this man. We have checked his last known address and all the Public Service Company's records and we have every right to read his testimony into evidence. The man was cross-examined at the time of his last testimony. I would also point to the transcript that, at that time, his address was given as 5598 Waterman. We have made effort to check these addresses, as the testimony of Mr. Kassel indicated, and we feel that the testimony of Mr. Schleuter is relevant and material to this lawsuit.

"MR. RICHARDSON: I object to the reading of it for the reasons heretofore stated. It is hearsay and no proper foundation has been laid for the introduction of the testimony.

"MR. SCHMIDT: Well, Your Honor, as to being hearsay, it was taken before a court of law, the man was sworn, he was questioned in this court after being sworn, the plaintiff was given an opportunity to cross-examine him, which could be the only objection plaintiff could have, that he was not given this opportunity.

"THE COURT: I sustain the objection to it.

"MR. SCHMIDT: Judge, at this time I also, in the same line, would submit the reading of the deposition.

"MR. RICHARDSON: Same objection; as hearsay, no foundation.

"MR. SCHMIDT: Let the record show that I ask that the transcript be made a part of my offer of proof and that the testimony of Mr. Schleuter,

given in the trial in the Circuit Court of the City of St. Louis, Division No. 5, be made as my offer of proof and the cross-examination of that testimony also."

The testimony Schleuter gave at the first trial appears in this transcript as a part of appellant's offer of proof. Respondent's counsel then took the stand and stated:

"At ten minutes to one today, I decided to try to locate Mr. Schleuter. I suspected he might be divorced and 'phoned the court here and found that there was a divorce suit—"

An objection to the telephone conversation followed and was sustained, following which a long discussion between court and counsel ensued out of the hearing of the jury, during the course of which respondent's counsel informed the court that he had found Schleuter within thirty minutes by using the telephone and offered to testify as to where Schleuter was, at 5628 Enright in the City of St. Louis, and just what counsel had done to locate him. The trial court pointed out to counsel that all the information he could give was obtained by telephone, and respondent's counsel then answered he would withdraw his testimony and made such announcement, at the trial court's suggestion, before the jury. Appellant's counsel then moved for a mistrial, which was denied, but the court granted appellant's request to instruct the jury to disregard " * * * any statements or comments that may have been made in rebuttal by Mr. Richardson."

■ The appellant contends that the giving of respondent's verdict directing Instruction No. 1 and Instruction No. 6 on the measure of damages constituted error. The instructions read as follows:

"INSTRUCTION NO. 1:

"The Court instructs the jury that if you find from the evidence that Mr. Kagan brought his automobile to a stop at Compton in obedience to a red electric stop-light signal which was then displayed, and if you further find that the defendant St. Louis Public Service Company suffered and permitted its streetcar to strike and collide with the rear end of Mr. Kagan's automobile after it had been stopped for ten seconds or more, and that in so doing the defendant failed to exercise ordinary care and was negligent, and that Mr. Kagan was injured as a direct result thereof, then and in that event Mr. Kagan is entitled to recover, and your verdict should be in his favor."

"INSTRUCTION NO. 6

"The Court instructs the jury that if you find your verdict in favor of Mr. Kagan, then it will be your duty to assess his damages in such sum of money as you find from the evidence will fully, fairly and reasonably compensate him for such injuries and their consequences as you find from the evidence that Mr. Kagan has suffered in the past and is reasonably certain to suffer in the future as a direct result of the collision mentioned in evidence.

"In assessing such damages, if any, you may take into consideration *first,* the nature, character, extent and permanency, if any, of such injuries, *second,* any condition of Mr. Kagan's duodenum which you find from the evidence that such collision, injuries and their treatment directly contributed to bring about, *third,* such pain and suffering of body and mind as you find from the evidence that Mr. Kagan has suffered in the past and is reasonably certain to suffer in the future as a direct result of such injuries and their consequences, if any, and *fourth,* the reasonable value of such medical care as you find from the evidence was reasonably necessary in the treatment and care of such injuries and their consequences, if any."

In contending that its motion for a directed verdict should have been sustained,

the appellant first urges that the submission made was on a theory not pleaded. The submission of Instruction No. 1 was that the appellant "* * * suffered and permitted its streetcar to strike and collide with the rear end of * * *" respondent's automobile. The respondent's petition alleged that on the occasion in evidence appellant's "* * * streetcar, traveling in an eastwardly direction on Olive Street, violently collided with the rear of said plaintiff's automobile." Among the eight allegations of negligence were,

"b. That the defendant, while operating its said vehicle as aforesaid, failed to have the same under such control that it could be stopped readily and reasonably upon the appearance of danger.

\*    \*    \*    \*    \*    \*

"e. That the defendant while operating its said vehicle as aforesaid, negligently and carelessly failed and omitted to stop the same before colliding with the other vehicle as aforesaid, and negligently overtook and struck plaintiff's automobile from the rear."

The appellant's contentions in this regard have no merit. The allegation that the streetcar violently collided with the rear of respondent's automobile is, in effect, the same as the allegation in the petition approved in State ex rel. Spears v. McCullen, 357 Mo. 686, 210 S.W.2d 68, 1. c. 71 [4, 5.] See also Vinson v. East Texas Motor Freight Lines, Mo., 280 S.W.2d 124, 1. c. [7], p. 133, where, as in the case at bar, the evidence tending to show the rear end collision went into evidence without objection. There is no claim of surprise. The same issues of law and fact were here involved as were at the first trial.

Appellant also contends there was no substantial evidence to support the submission made. There can be no doubt but that respondent made a prima facie case under the rear end doctrine, Hughes v. St.

Louis Public Service Co., Mo.App., 251 S.W.2d 360 at [3], p. 362. Appellant's argument is that the word "suffer" means "* * * to allow or permit" and cites Webster's Unabridged Dictionary to that effect. Appellant further urges that "permit" implies knowledge and consent. The result, under appellant's reasoning, is that to allege one "suffered or permitted" something to take place charges misfeasance or affirmative wrongdoing. The appellant then argues that, quoting from its brief, "All the evidence in the case at bar indicates that the defendant was doing everything humanly possible to avoid the collision" and therefore could not have been allowing or permitting the collision to occur. The appellant relies upon and cites the witness Christie's testimony to support its statement as to what all of the evidence shows, but that was not what Christie testified to. That witness testified that the streetcar approached at undiminished speed even though it is not disputed the respondent's automobile was stopped in plain view directly ahead of the streetcar and that from the look on the motorman's face it appeared to the witness that he was doing everything possible to avoid the collision. Moreover, the appellant's own expert witness testified that because streetcars are more difficult to bring to a stop than are automobiles it is necessary to start stopping them sooner and to pay more attention than one would with an automobile. Disregarding for the moment (for the purpose of illustration only) the fact that Christie's actual testimony is not subject to the construction appellant places on it and was only as to what appeared to him to be the case, the jury was justified in drawing the conclusion that despite any last minute efforts the operator was negligent. The streetcar may have had bad brakes of which the operator was aware long before this accident. The operator may not have been paying that extra degree of attention, or have failed to begin the stopping process soon enough. Having made a prima facie case, it was not incumbent upon the respondent to show why the collision occurred.

Instructions containing the words "permitted" or "allowed" or their equivalents have been repeatedly used in instructions submitting the "rear end collision" doctrine. See Hughes v. St. Louis Public Service Co., supra; McVey v. St. Louis Public Service Co., Mo., 336 S.W.2d 524; Jones v. Central States Oil Co., 350 Mo. 91, 164 S.W.2d 914, also Mo.App., 170 S.W.2d 153; State ex rel. Spears v. McCullen, supra; Millard v. St. Louis Public Service Co., Mo.App., 330 S.W.2d 147. Appellant contends that the Millard case, cited above, criticizes the use of the word, "permit." This is not the holding of that case which in fact ruled the contention that as the instruction there involved was worded, it was possibly subject to the construction that it assumed a disputed fact. In Millard, 330 S.W.2d 147, this court held that under the facts and other instructions offered in that case the jury could not have been misled, and that is even more true in the instant case.

■ The appellant also attacks the giving of the instruction on the ground that it " * * * submitted a charge of negligence which was outside the scope of the pleadings and thereby erroneously injected a foreign issue into the lawsuit." It argues that since none of the allegations of negligence in the petition charged it with "suffering and permitting" the collision, the submission is outside of the scope of the pleadings. The purpose of the petition is to inform the defendant of the nature of the action and advise him of what he must defend against, Missouri Digest, Pleading, ☞381/2. The petition in this case met that test. The first trial of this case, on the same petition, certainly apprised appellant of respondent's reliance upon the "rear end collision doctrine" and thus it cannot be said to be, under these facts and pleadings, a "foreign issue." Moreover, appellant fails to state how it would have proceeded otherwise than it did, had the "foreign issue" not been injected. In fact, under the evidence here present it is difficult to see how it could have proceeded any differently so far as its theory is concerned.

■ Appellant also urges that the instruction " * * * should have hypothesized in which direction plaintiff's automobile was traveling and that defendant's streetcar was traveling behind him in the same direction and that defendant's streetcar overtook and struck plaintiff's automobile" and that the failure to so hypothesize constitutes prejudicial error. But there was no dispute as to these facts. Appellant's own photograph showed rear end damage to respondent's automobile. During his argument appellant's counsel stated that appellant was not denying that the streetcar struck the back of the automobile. In view of all of this, and keeping clearly in mind the factual situation as shown by the undisputed evidence, it is clear that the elements which appellant contends should have been hypothesized were in fact undisputed and therefore need not have been hypothesized. It follows from the above that the trial court did not err in giving Instruction No. 1 nor in its ruling upon the appellant's motion for a directed verdict.

■ The appellant contends that the trial court prejudicially abused its discretion by sustaining respondent's objection to the reading of the testimony the motorman Schleuter gave at the first trial. The appellant also assigns as error the trial court's same ruling as to the deposition Schleuter gave prior to the first trial. However, no offer of proof was made as to the deposition and it is not included in the transcript. The objection to reading the prior testimony was made on the ground that appellant failed to use due diligence in obtaining service. Civil Rule 57.29, V.A.M.R., is the same as Section 492.400 RSMo 1959, V.A. M.S., as amended, Laws of Missouri 1959, Senate Bill No. 116. Section 1, Paragraph 2, subsection (6) thereof provides for the reading of depositions,

"If the witness is absent without the consent, connivance or collusion of the

party requiring his testimony and the party, in the exercise of due diligence, has been unable to procure the attendance of the deponent by subpoena."

Section 492.410 RSMo 1959, V.A.M.S., has been construed to provide that competent testimony of a witness preserved in a transcript of the record in a cause may be used in the same manner and with like effect as if such testimony had been preserved in a deposition in the cause, Eickmann v. St. Louis Public Service Co., Mo., 323 S.W.2d 802. In Welp v. Bogy, 218 Mo.App. 414, 277 S.W. 600 at [5–7], p. 604, this court held that

"It is manifest that no definite rule can be laid down as to what would constitute a showing of due diligence in all cases."

See also Welp v. Bogy, 320 Mo. 672, 8 S.W.2d 599 at [10–11], p. 601. Appellant, by its very statement of its contention, recognizes that the determination of whether such testimony or deposition should be admitted lies within the trial court's discretion in determining if an adequate foundation of the showing of due diligence has been made. It follows that absent an abuse of that discretion, the trial court's ruling will not be disturbed by us, Collins v. Leahy, 344 Mo. 250, 125 S.W.2d 874 at [1–6] pp. 879–881; see also Collins v. Leahy, 347 Mo. 133, 146 S.W.2d 609; Taylor v. Laderman, 349 Mo. 415, 161 S.W.2d 253 at [6–7] p. 256.

The appellant cites and relies upon Welp v. Bogy, supra. It is true that at page 604 of 277 S.W. 600, the opinion in that case states that "The authorities seem to hold * * *" that what was here done would satisfy the requirements of due diligence, but a more careful reading will disclose that the court's discussion of the point was in fact obiter dictum and that the court's actual ruling of the point was on the contention that the testimony had not been preserved in the bill of exceptions. We think this case illustrative of wisdom

of the application of the rule of deference in such matters. We do not find the trial court's discretion to have been so abused as to require our interference. The point is ruled adversely to the appellant.

The appellant first urges that the giving of Instruction No. 6 was prejudicially erroneous because it authorizes a recovery for permanent injury when, according to appellant's brief, "* * * there was no substantial evidence to support such a finding." This contention requires only a brief review of the medical testimony. The respondent's complaints of injury were as to a cervical sprain, a lumbosacral sprain, a head injury resulting in headaches, and a nervous reaction contributing to cause a duodenal ulcer and a twitching near his eye. The transcript discloses the following questions and answers of and by his treating doctor:

"Q Then, it is your opinion that, if this ulcer heals up without perforation or operation, that he will, in your opinion, have a permanent condition by virtue of formation of scar tissue, and with increased susceptibility of a recurrence of the duodenal ulcer?

"A Yes, I believe he will.

"Q This condition has gone on for two years, Doctor. Let's say that he has had some improvement in his neck. The back, he has testified, is in about the same condition. I will ask you to tell the Court and jury whether or not, in your opinion, he will have some permanent injury to his neck and his back as a result of this occurrence.

"A Oh, I think he will have some permanent effect."

Appellant urges that the last answer is not responsive to the question and that it "* * * is less than substantial evidence of permanent injury." So far as this transcript discloses, there was no objection upon the ground of unresponsiveness nor any objection at all. That the witness used

the words "permanent effect" instead of "permanent injury" in his answer does not constitute such unresponsiveness as to warrant a reversal. Neither does the use of the word "effect" instead of "injury" so diminish the probative force of the answer that it can be said to fail to constitute substantial evidence of permanency to support the giving of Instruction No. 6.

According to appellant's allegations, the instruction is erroneous for the further reason that it permitted the jury to consider any condition of the duodenum which they might find from the evidence the collision contributed to bring about. Appellant contends the evidence was " * * * insufficient to show a causal connection between plaintiff's ulcer and the accident" and urges that "This testimony as to the causal connection between the accident and the many other factors and the duodenal ulcer does not go beyond an expert opinion that there might or could be a connection between the ulcer and all of the other conditions set forth in the question."

But the transcript, viewed in the light we are required to take of it, discloses otherwise. The treating physician was asked a hypothetical question concerning causation, which question, after incorporation into it of certain additional facts requested by the appellant, was not objected to, and to which the doctor answered,

> "A My answer would be that the conditions you described, *I believe would be a definite precipitating cause or contributing cause to the occurrence of the ulcer in Mr. Kagan.* This, plus the administration of cortisone on my part, plus aspirin and other drugs for treatment of his neck and painful neck and back." (Emphasis supplied.)

Dr. Lam was also asked the same hypothetical question, again without objection by the appellant after respondent's counsel incorporated in the question certain additional facts which appellant suggested. His answer was a flat "Yes." Both witnesses gave reasons for and explanation of their answers. This testimony was not conjectural or speculative but, to the contrary, was, when read in context as set out above, a definite, certain answer. Moreover, the appellant's own medical witness cured any supposed deficiency by his testimony. It was his opinion that the ulcer was caused by the cortisone prescribed for the respondent's neck and back injuries and he testified that if the cortisone was so prescribed, and that is undisputed in this record, then he would have to say that the accident caused the ulcer. The whole effect of his testimony on this point is that the treatment of the other injuries which respondent contended he received in this accident, i. e., the cortisone prescribed for the neck and back injuries and pain, directly contributed to bring about the condition of the respondent's duodenum. This was what the instruction submitted. There was no prejudicial error in the giving of Instruction No. 6.

The final contention is that the verdict was excessive. In considering this point we will review the evidence in the light most favorable to the respondent. See Rossommano v. Quality Dairy Co., Mo. App., 297 S.W.2d 591 at 593[2]; Missouri Digest, Appeal and Error, ☞932(1), 989. The respondent was 34 years of age at the date of trial, October 18, 1960. At the time of the accident he was between jobs and was going to work as a drug salesman after completion of a two-week tour of active military duty. Respondent testified he was moved backwards and forwards by the impact and his head either hit his hand on the steering wheel or the wheel itself; that on the way to his home after the accident his stomach became upset and he vomited; that while he was home he didn't feel like eating, his stomach being upset and his back, neck and shoulders were getting stiff; the next day he went to see Dr. Rosecan, having arranged for the troop convoy going to camp to leave without him; Dr. Rosecan had X-rays taken and prescribed medication which the re-

spondent used while at camp; that while there he was in "some pain" and went to see his regimental surgeon who also prescribed medicine which he took, and that he was able to attend to his duties as operational officer. Respondent further testified that upon his return he began his new employment and continued to see Dr. Rosecan who recommended a gastro-intestinal series of tests and placed him on a bland diet and rest; that Dr. Rosecan sent him to Dr. Lam for consultation, that Dr. Lam, among other things, recommended a collar for neck support which the respondent never wore because he felt it affected his business; that he does wear a lower back support; that pain in his back and abdominal distress prevented him from driving long distances and as a result he could not cover his assigned territory; that his neck movement was restricted to a great degree and he had pain whenever he turned his neck; that his neck has improved some; that support and heat has also improved his back but he still has pain when driving and when he is not doing anything so that there is very seldom a day that he does not have some pain or "trouble" in his lower back; that his stomach pain, which he described as a "gnawing, sometimes burning" sensation, is controlled now at a constant level although sometimes it flares up worse than at other times; and that he never had this trouble before the accident. The respondent was involved in a collision in 1957 in which his neck, left shoulder and upper back were injured and made a claim for these injuries but had experienced no trouble since that time. He did not lose any wages from his first employer after the accident, being paid a straight salary, but at the time of trial he was being paid on a commission basis and testified that his pain and other discomfort resulted in a limitation of the work required of him and thus of his income.

Dr. Rosecan testified that on the first visit the respondent held his neck rigid and had tenderness over the base of the sixth and seventh cervical vertebrae with some muscle spasm which was painful and that the respondent was unable to flex his neck and was limited in its turning also. Respondent also had a large bruise and swollen area over the right forehead and tenderness over the lumbosacral joint with some limitation of extension and flexion. Dr. Rosecan further testified that respondent related that he vomited and was dizzy after the accident; that his diagnosis then was a sprain of the cervical and lumbosacral spine, a head injury, and post-traumatic headaches, and recommended medication of Sigmagen, a cortisone drug used to relieve muscle spasm, codeine, use of a bedboard, massage of the areas of pain and muscle spasm, and heat treatments; that he next saw the respondent one month later when he also complained of stomach trouble; that he then put respondent on an "ulcer diet" with "antacids" and obtained an upper G–I Series; and that respondent was referred to Dr. Lam for examination and consultation regarding his back and neck. It was the opinion of this witness that the X-Ray G–I Series showed the respondent had a duodenal ulcer, and that this diagnosis was compatible with respondent's complaints. In addition to the "ulcer diet" the doctor prescribed Amphojel and Maalox to neutralize acid, an "antispasmodic group of drugs which are designed to cut down on some of the nervous impulses to the stomach * * *", advised sleep and relaxation with an avoidance of an excessive number of work hours, and took respondent off of cortisone. The doctor saw respondent twelve times and the last time he saw him about a month before trial respondent was complaining of continued indigestion, had recently had a severe flare-up of his ulcer, still had pain in the neck and lower back area which became worse on any bending or lifting, had tenderness in the upper portion of the stomach, and still had tenderness with muscle spasm in the neck and back. The witness testified that his charges to date of trial were $275.00 to $300.00 and that these were reasonable charges.

Dr. Lam testified that he specializes in diseases of the brain and nervous system; that he first examined respondent on September 15, 1958, and found intermittent twitching of the left eyelid, 25% restriction of neck motion " * * * particularly on left lateral rotation or twisting of the neck to the left, extension of the neck—that is placing the neck backwards—and tenderness in those areas. There was a posterior cervical muscle spasm. * * *" He recommended conservative treatment such as rest, restriction of motion, local heat, and use of a Thomas Collar.

█ It is well recognized that in determining the excessiveness of a verdict each case must stand upon its own facts. However, due regard is to be given to approved awards in other cases, Kulengowski v. Withington, Mo.App., 222 S.W.2d 579. Appellant does not cite any cases involving similar injuries as here upon which it might urge that this verdict violates the "approximate uniformity" discussed by the court in the Kulengowski case. As stated in Rossommano v. Quality Dairy Company, Mo.App., 297 S.W.2d 591, at l. c. 594,

"* * * This court can only interfere where excessiveness appears as a matter of law; that is, when the verdict is clearly for an amount in excess of the very most that the proof of damages would reasonably sustain, and then only when the judgment is excessive to the degree that it shocks the conscience of the court. Mickel v. Thompson, 348 Mo. 991, 156 S.W.2d 721; Biener v. St. Louis Public Service Co., Mo.App., 160 S.W.2d 780; Montana v. Nenert, Mo.App., 226 S.W.2d 394."

We find no merit in appellant's contention of excessiveness.

The judgment should be affirmed. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion of BRADY, C., is adopted as the opinion of the court. The judgment is therefore affirmed.

ANDERSON, P. J., and WOLFE, J., concur.

RUDDY, J., not sitting.