**DENTON CONSTRUCTION COMPANY, a Michigan Corp., Appellant-Respondent,**

v.

**MISSOURI STATE HIGHWAY COMMIS-SION et al., Appellants-Respondents.**

No. 54072.

Supreme Court of Missouri,
Division No. 2.

April 13, 1970.

Motion for Rehearing or for Transfer to Court En Banc Denied May 11, 1970.

Leslie W. Fleming, Detroit, Mich., John W. Inglish, Jefferson City, for plaintiff-respondent-appellant.

Carson, Inglish, Monaco & Coil, Jefferson City, Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., of counsel.

Robert L. Hyder, Bruce A. Ring, Jefferson City, for defendant-respondent-appellant.

STOCKARD, Commissioner.

The State Highway Commission of Missouri (hereafter referred to as the "Commission") entered into a contract with the R. B. Potashnik Company for the construction of the roadbed[1], ditches, slopes and

---

1. The term "roadbed" as used herein means the graded areas between the outside shoulder lines. The term "roadway" means the graded areas of the highway including the roadbed, median, slopes, and ditches.

median for a fifteen mile section of Inter-state Highway 55, a four-lane divided highway. That contract and the work done pursuant to it will hereafter be referred to as Project 16. It was completed in October 1963, and the Commission accepted and approved the work. The Commission then entered into a contract with plaintiff on January 21, 1964 for a second stage of construction, hereafter referred to as Project 17, which consisted primarily of laying pavement and soil cement shoulders on the roadbed previously constructed under Project 16. It also included the construction of guardrails, signs, and some lighting fixtures, but those matters are not material to the issues on this appeal.

At the time plaintiff's representative inspected the project site prior to submitting its bid, there had been some erosion on the higher fills. In the contract for Project 17, there was Special Provision S entitled "Embankment in Place" which in substance provided that in submitting its bid plaintiff should include a "lump sum" for work which would be required because of "conditions resulting from erosion," and in the special provision it was stated that "This item of work will apply to material necessary to restore the roadbed from outside shoulder to outside shoulder to proper section and the necessary blending into the fill slopes adjacent thereto." Plaintiff included in its bid a "lump sum" of $20,000 for this item. Material was removed from the roadbed by rain and wind and deposited in the median and ditches, and the slopes and shoulder areas were damaged. Before plaintiff could perform the laying of the pavement and the placing of soil cement on the shoulders in accord with the specifications, this damage to the roadbed had to be repaired. To accomplish this, new and additional material had to be placed on the roadbed and shoulders, and the material then had to be graded to restore the roadbed to its previous condition. Plaintiff's claim for $138,910· for performing this work was set forth in Count II of its petition. The Commission took the po-

sition that under the terms of the contract for Project 17, plaintiff was obligated to perform whatever work was necessary to repair all and any damage to the roadbed resulting from rain and wind erosion.

The Commission also took the position that plaintiff was required under the terms of the contract for Project 17, to repair all erosion damage to the roadway, which included the median, slopes and ditches. Over the protest of plaintiff this demand of the Commission was enforced by refusing to approve and accept the work on Project 17, the approval and acceptance being on a mile-by-mile basis, until the work in the median and ditches and on the slopes was performed by plaintiff. That work consisted primarily of removing or redistributing the excess material washed or blown into the areas and then regrading, shaping and reseeding the areas. The Commission agreed to and did pay plaintiff for reseeding these damaged areas after plaintiff had restored them, but it insisted that all other work be done without additional compensation. Plaintiff obtained additional equipment and manpower and performed the necessary work to restore the roadbed, shoulders, and the areas of the median, ditches and slopes, and it also laid the pavement and soil cement and performed the other work within the time prescribed for the completion of Project 17. Plaintiff's claim for $133,122 for removing the eroded material from the median and ditches was incorporated in Count III of its petition, and its claim for $104,160 for regrading and reshaping the slopes, median and ditches was set forth in Count IV.

In addition to the above, plaintiff contended that after it started work on Project 17, it was furnished a copy of "final" plans for Project 16 which disclosed, disregarding the question of damage from erosion, that the roadbed had not been constructed according to the plans which had been furnished to plaintiff and which were a part of its contract, and that additional work was required by reason of this. Plaintiff's claim in the amount of $10,025

for supplying a deficiency of 5,012 cubic yards of material was set forth in Count I.

The trial court held that erosion damage to the roadbed, that is, the areas where pursuant to the terms of the contract for Project 17 plaintiff was to lay the pavement and soil cement, occurring after the execution of the contract and the necessary work to correct the damage, was a contingency assumed by the plaintiff, and it entered judgment for the Commission on Count II of the petition.

The trial court entered judgment for plaintiff on Counts III and IV, and held that plaintiff was entitled to compensation in the amount of $240,957 for removing eroded material from the median and ditches and for regrading and shaping the median, ditches and slopes. The trial court also entered judgment for plaintiff on Count I and held it entitled to damages in the amount of $10,024 for the failure of the Commission to provide a roadbed which conformed to the plans. The total judgment in favor of plaintiff was $250,981. Both parties have appealed. We will consider first the appeal of the Commission.

The Commission first challenges the award to plaintiff of $10,024 on Count I. The Commission argues that the evidence does not show any actual shortage of material, and then asserts alternatively that payment was made to plaintiff for a "quantity of waste soil cement sufficient to offset any shortage of material as alleged."

██ The Commission concedes that there was a "theoretical" shortage on the roadway of 5,012 cubic yards of material. This came about by reason of a change in what the witnesses referred to as the "template" during the construction work on Project 16 with no corresponding change in the plans which were the basis of plaintiff's bid on Project 17. The difference was discovered by plaintiff during the work on Project 17. Because the roadbed had been severely damaged by erosion it

was impossible to determine with accuracy the actual shortage in the amount of material. The Commission's resident engineer testified that "there was theoretically five thousand and so much short" in the material, and that "any dirt that was required to be furnished, [plaintiff] did furnish." In addition, there was introduced in evidence by plaintiff its Exhibit 23, which was a letter from the Commission, signed by its chief engineer, addressed to plaintiff. This letter set forth a ruling by the Claims Committee of the Commission on plaintiff's claims. By that letter the Commission agreed that "payment should be made for the embankment material theoretically not placed by the grading contractor due to the difference in the grading and paving typical sections." It was also stated that "We have made a very detailed study of the difference in the quantities involved, and have arrived at a figure of 5,012 cu. yds. instead of the 3,391 cu. yds. as computed by you. At the $2 per cu. yd. bid price for this item, this would total $10,024.00." It thus appears that the Commission admitted that there was a "theoretical" shortage, and it also admitted that after a "very detailed study" of the actual shortage it had arrived at the figure of 5,012 cubic yards. It is true that these admissions and the computation by the Commission were incorporated into the letter as a part of an "offer of $10,024.00 as full and complete settlement of your claim against the Commission," and ordinarily such an offer would not be admissible in evidence to prove the facts stated therein. However, the letter was admitted into evidence with "No objection" to any part of it. It was not offered for any limited purpose but was admitted generally. Under these circumstances its contents may properly be considered as evidence of the facts therein set forth. The finding of the trial court was that the "difference in the worksite as constructed and as shown on the plaintiff's plans was computed by the Commission to represent a shortage of 5,012 cubic yards of material spread along the edge of 60 miles of shoulder. Thus, the

plaintiff was required to provide 5,012 cubic yards of additional material to make the worksite conform to the plans." Based upon our study of the evidence, and also affording due deference to the findings of the trial court, we conclude that the trial court correctly found that there was an actual shortage of material in the amount of 5,012 cubic yards.

■ We find no merit to the Commission's alternative assertion that it is entitled to "off-set any shortage of material." First, the claim to a setoff was not pleaded, and as far as we can determine it was first mentioned in the motion for new trial. Second, the evidence does not support the claim. The Commission relies on the testimony of its resident engineer to the effect that during the placement of soil cement, problems developed and payment was allowed for the use of additional soil cement. The reasons testified to at trial by the engineer for permitting the use of additional soil cement were not the same as the "reasons" approved by the same engineer and attached to the change order authorizing the use of and payment for additional soil cement. In addition, this witness testified that "The extension of this soil cement had nothing to do particularly with the shortage or lack of dirt, as you call it, if there is any. It was strictly for the finishing of the soil cement." He also testified that the change order allowing compensation for additional soil cement "was drawn up with no theoretical shortage of dirt in mind." The substance of the Commission's contention is that because it determined that additional soil cement should be used "for the finishing of the soil cement" and it made a change order allowing payment for its use, it should now be permitted to offset this additional soil cement against the shortage of 5,012 cubic yards of material which it found, after a "very detailed study," to constitute the actual shortage of material. We do not agree.

■ The second part of the Commission's challenge to the judgment entered on Count I is that it made no warranty or representation upon which plaintiff was entitled to rely that all material necessary to complete the project was in place. We cannot agree with this contention. When the Commission furnished plaintiff the plans for the project, which showed that the roadbed had previously been constructed, that constituted a representation by the Commission to plaintiff that the roadbed had been constructed according to those plans, or at least within the generally accepted tolerances. We do not understand the Commission to contend otherwise. Its position, from its carefully worded point, is that this was not a representation "upon which plaintiff was entitled to rely." The Commission relies on several provisions in its Standard Specifications, a hardbound book of more than 750 pages and made a part of the contract by reference. This book covers all features of highway construction, and in determining the application of any specific provision consideration must be given to its context, to the factual circumstances, and to the scope of the contract. In this case, the contract with plaintiff was primarily one for paving and shoulder preparation, at least in the respects with which we are concerned. It was not a situation where a contractor engaged to perform all work from the preparation of the roadway including slopes, ditches, medians, and roadbed to the final paving and finishing of shoulders.

The Commission relies on the following provisions of its Standard Specifications under Section 22, entitled "Subgrade Preparation."

"22.5 Method of Measurement."

"22.5.1. No Measurement will be made of any work performed under the requirements of subgrade preparation. On projects graded previously under a separate contract and designated primarily as surfacing projects, minor drifting of excavated material to construct the subgrade, shoulders and ditches to proper grade and section is to be expected. Minor drifting

shall be considered the moving of that amount of material one scraper, carrying approximately 10 cubic yards of material, can shift without delay to normal subgrading operations. Any additional material required to complete the subgrade or shoulders to proper grade and cross section shall be obtained from within the right-of-way limits."

"22.6 Basis of payment."

"22.6.1. Work done in preparing the subgrade will not be paid for as a separate item but the cost will be considered as completely covered by the contract unit price of other items."

The Commission also relies on the following provisions under Section 22.20 entitled "Subgrading and Shouldering."

"22.24 Construction Procedure."

"22.24.1. * * * Minor drifting of excavated material to bring the subgrade, shoulders, and ditches to proper grade and section is to be expected. * * *."

"22.24.2. Any additional material required to complete the subgrade or shoulders to proper grade and section shall be obtained from within the right-of-way limits as directed by the engineer. Direct payment will not be made for minor drifting of excavated material, or for any additional material required; nor will overhaul be allowed for such operations. Excess excavation shall be used for widening shoulders on fill sections or wasted within the limits of the right-of-way."

The Commission argues that by reason of the above provisions plaintiff "should have satisfied [itself] as to the extent of this drifting of material and the addition of material by investigation of the work to be performed on the site." Upon what theory the Commission relies upon the provisions pertaining to the drifting of material is not clear. The need to supply 5,012 cubic yards of material to bring the roadbed to the specifications which the Commission

had represented existed at the time plaintiff entered into its contract, had nothing to do with the drifting of material as that term is used in the Standard Specifications. Plaintiff does not claim any compensation for drifting. It seems that the commission's position is that plaintiff should have made an investigation to determine that the commission was wrong when it represented to plaintiff that the roadbed had been built to specifications, and that it should have determined that in fact the roadbed was short by 5,012 cubic yards of material. Then, after obtaining this information, not only as to the actual shortage but the misrepresentation by the Commission, plaintiff should have realized that by reason of the above provisions in the Standard Specifications it would be required to correct any deficiency without additional compensation. We note that Mr. Carman, plaintiff's area manager, testified that "the bid plans and specifications [were] incorporated as a part of the contract" with plaintiff, that they showed the existence of a worksite in a prescribed condition as the result of the work done under Project 16, and that although he inspected the worksite, there "was no way that anybody could determine" that there was a deficiency of 5,012 cubic yards of material "except to take a survey party and cross-section it" which would have taken two months, and he only had one week in which to prepare his bid. In addition, the deficiency resulted from a change in the template, ordered by the Commission, during the construction of Project 16, and while plaintiff had no reason to know that the roadbed had not been constructed according to the plans and specifications furnished it and upon which it based its bed, the Commission either knew it or should have known it. The fact is that the Commission requested plaintiff to submit its bid for laying pavement and soil cement on a roadbed previously constructed. The contract contemplated the moving or adding of dirt or material only to the extent necessary to prepare a previously constructed roadbed for pavement and for soil

cement shoulders. In some situations additional material could be required because of settling or erosion to bring the roadbed back to its previous condition, but plaintiff's contract did not purport to call for the construction of any part of the roadbed. Under these circumstances, the provision in Section 22.24.2 that no "direct payment" will be made for "minor drifting" or for "any additional material required" cannot be construed to mean that the Commission can enter into a contract to have paving and soil cement placed on a roadbed, represented by the Commission to have been constructed according to certain specifications, and then require the contractor to supply without compensation 5,012 cubic yards of material to bring the roadbed up to represented specifications when that 5,012 cubic yards of material had never been placed there.

We conclude that the Commission did represent that the roadbed was built according to the plans and specifications furnished to plaintiff, that plaintiff was entitled to rely on that representation, that there was an actual deficiency of 5,012 cubic yards of material, and that the trial court correctly entered judgment on Count I for plaintiff in the amount of $10,024.

We turn now to the Commission's challenges to the judgment in favor of plaintiff on Counts III and IV.

The Commission contends [point III in its brief] that (1) the trial court's judgment imposed on it an obligation to plaintiff for losses sustained "because of weather conditions" contrary "to the law of this state and to the terms of the contract;" (2) the judgment was erroneous [point IV in its brief] because "the work was embraced within the contract and the payment to plaintiff was included in the contract price," and as an alternative contention (3) that "if [the work was not embraced within the contract] then the judgment allows recovery for work outside the contract not authorized by law." In points V and VIII

of its brief, the Commission adds collateral contentions to (2) above as to Count IV on the ground that "the work alleged to have been performed was a part of the work contemplated under the specification of seeding, for which plaintiff was admittedly paid," and the judgment "fails to give consideration to the fact that at least a part of the work of restoring the damage caused by erosion was made necessary by the plaintiff's operations."

A brief review of the facts is appropriate. By Count III plaintiff sought compensation for being compelled by the Commission to remove the material washed and blown from the roadbed into the median and ditches. By Count IV compensation was sought for being compelled by the Commission to regrade and shape the median, slopes and ditches. The plaintiff did this work under protest, and under the compulsion by the Commission that if not done, none of the work pursuant to Project 17 would be approved, and no payment by the Commission would be made. We note that the Commission does not contend that the work was not done, although it challenges the proof as to the quantity and contends that plaintiff was to do all or some of the work without additional compensation.

We shall first rule on the Commission's point III. There, as previously set out, the Commission asserts that the trial court imposed an obligation on the Commission to plaintiff because of weather conditions. This contention is devoid of support in the record. It is true that weather conditions resulted in erosion damage to the roadway, but that was not the basis of the judgment on Counts III and IV, and nothing in the record indicates that it was. Plaintiff's theory was that the Commission breached its contract by refusing to approve and pay for the work done by plaintiff on Project 17 until plaintiff performed work not covered by or included in its contract. The Commission's theory was that the work it required plaintiff to perform in restoring the median, ditches and slopes was includ-

ed in the plaintiff's contract. The fact that the work was made necessary because of erosion was immaterial. It could have resulted from any cause. The issue was whether the contract placed the responsibility to repair the damage, whatever the cause, on plaintiff. The cases cited by the Commission are not in point. In Webb-Boone Paving Company v. State Highway Commission, 351 Mo. 922, 173 S.W.2d 580, and Sager v. State Highway Commission, 349 Mo. 341, 160 S.W.2d 757, it was held in substance that when a party agrees to do certain work for a fixed price he will not be excused from performing or be entitled to additional compensation because of unforeseen difficulties in performing the work *covered by the contract*. See also Rock Hill Asphalt & Construction Company v. State Highway Commission of Missouri, Mo., 452 S.W.2d 810. The issue in this portion of the Commission's appeal is whether the work was or was not covered by the contract; not whether plaintiff is entitled to additional compensation because weather conditions hampered it in the performance of work covered by the contract.

We consider now the Commission's contention in Point IV that "the work was embraced within the contract." The Commission relies on Section 22.21.1 of its Standard Specifications which provides: "Subgrading and shouldering shall consist of preparing a subgrade for a concrete pavement with or without aggregate base and the shaping of shoulders, fill slopes, inslopes and ditches as may be required to complete a finished roadway, all in accordance with the requirements of Secs. 21.20 [Compacting], 22.00 [Subgrade Preparation], and 23.20 [Shouldering]." The Commission then argues that by the item of work, "subgrading and shouldering," which was a bid item under plaintiff's contract it was anticipated that if necessary, work would be performed by plaintiff without additional compensation on the slopes and ditches to make the roadway a finished product. Reliance is again placed on Sager v. State Highway Commission, supra,

and Webb-Boone Paving Company v. State Highway Commission, supra, and the argument is again made that when a party agrees to do work for a fixed price he will not be excused from performing, or be entitled to additional compensation, because unforeseen difficulties are encountered. However, the Commission passes over the essential question, at least except for the reference to Section 12.21.1, of whether the work was included in the contract with plaintiff.

 As previously noted, in determining the application of any specific provision of the Standard Specifications consideration must be given to the scope of the contract, and the provision must be considered in context. While the Standard Specifications cover all types of work involved in highway construction, it does not necessarily follow that each provision of the Standard Specifications apply to a contract for the construction of a part or stage of the total construction of a highway.

 In this case, the contract contemplated that plaintiff would place the paving and soil cement on a previously constructed roadbed. Section 2.4.1 of the Standard Specifications provides that bidders shall examine the "site of the proposed work." This refers to the work to be performed under the contract. Whether or not plaintiff should have anticipated subsequent erosion in other areas covered by Project 16 is immaterial. That was not the site of the proposed work under Project 17. Special Provision H in plaintiff's contract made this clear. It provides that "The contractor [plaintiff], in performing the work of this contract and proposal, shall not disturb mulched and seeded areas and erosion net installations that have been executed by previous contract. Any such locations defaced by the movement of materials and equipment shall be restored by the contractor. Materials and procedures used in repairing damaged areas shall conform to the Standard Specifications and the requirements of similar construction

items provided in this contract. No direct payment will be made for re-establishing the affected areas." In addition, reference should be made to Section 4.6.2 under the general heading of "Scope of Work." It provides, in substance, that in contracts "involving grading other than incidental work in connection with resurfacing," the contractor is required to open and clean "all existing channels and culverts." Special Provision D in plaintiff's contract, under the title of "Scope of Work," provides that "Section 4.6.2 shall be amended to the effect that only structures involving drainage of the median shall be cleaned out * * *." From the purpose of plaintiff's contract, and the Special Provisions therein as set out above, it is evident that the site of the proposed work for Project 17 did not extend into the graded, seeded, and mulched areas of the median, slopes, and ditches which had previously been prepared under Project 16, and which the Commission had paid for and accepted, except to the extent that work was to be performed there, if any, pursuant to the Items for Embankment in Place, previously referred to, or pursuant to some other express provision. Section 22.21.1 of the Standard Specifications must be construed in the light of the Special Provisions, which by Standard Specification 1.30, "Shall prevail over standard specifications, and plans whenever in conflict therewith." When so considered, the provision in Section 22.21.1 that the contractor shall "fill slopes, inslopes and ditches as may be required to complete a finished roadway" does not apply to plaintiff's contract.

We conclude that the trial court correctly held that "Under plaintiff's contract no work was contemplated to be done on the median, slopes and ditches except as covered by Special Provisions and the seeding of the lower one-third of the median."

The Commission next seeks to avoid liability to plaintiff for the work required outside of the scope of the contract, on the ground that "if it was not within the scope of the contract, then it consists of extra work not awarded according to the statutes and plaintiff cannot recover compensation for it." The Commission relies on § 227.100 RSMo 1959, V.A.M.S., which provides that "All contracts for the construction of said work shall be let to the lowest responsible bidder or bidders * * *," and to pars. 3 and 4 of Art. III, § .39, Constitution of Mo., V.A. M.S., which, in substance, prohibits the granting of additional compensation to any person after the services have been rendered or after a contract is entered into or performed in whole or in part, and prohibits the payment of any claim under any contract made without express authority of law. However, plaintiff does not claim that it entered into an agreement, oral or implied, with the Commission for the extra work. Instead, it seeks compensation for a breach of the contract by the Commission. In Spitcaufsky v. State Highway Commission, 349 Mo. 117, 159 S.W.2d 647, this court considered the above statutory provision and comparable constitutional provisions, and there held that "if the contractor is subjected to increased expense * * * for extra work not called for by his contract, or which the conduct of the [Commission] alone rendered necessary, then the contractor may claim extra compensation therefor." It was further held that "We are unable to go so far as to hold the constitutional provision and statute, supra, protect the Commission altogether from breach of its own valid contract," and that "So far as concerns the constitutional question raised by the Commission, we hold * * * that if the delay here was caused wholly by unwarranted action of the Commission, [the comparable constitutional and statutory provisions] do not bar recovery of compensatory damages by [the contractor]." See also the statement in the concurring opinion in Rock Hill Asphalt & Construction Company v. State Highway Commission of Missouri, supra, "Where the facts are such that the Highway Commission does breach a provision in its contract, or breaches a

warranty in its plans and specifications on which the contractor is entitled to rely, plaintiff's position that the Commission can and should be liable for such breach of contract or breach of warranty is sound."

In this case the work performed by plaintiff outside of its contract resulted from the unwarranted action of the Commission in requiring the plaintiff to perform that work before it would approve and pay for any of the work covered by the contract. The statute and constitutional provisions relied on by the Commission do not bar plaintiff's right of recovery.

■ The Commission next asserts that the court erred in entering judgment for plaintiff on Count IV "for the reason that the work alleged to have been performed was a part of the work contemplated under the specification of seeding, for which plaintiff was admittedly paid." By Count IV plaintiff alleged that in addition to excavating the excess material deposited by the wind and rain in the median and ditches, which was the basis of the claim made in Count III, "it was necessary in repairing the damage to regrade the median, slopes and ditches in order to restore them to approximately the condition shown on the bid plans." We do not understand the Commission to contend that this work was not done; its contention is that "admittedly these were the areas to be seeded, and the grading was necessary to rid the surface of irregularities so that it could be seeded."

As a part of Project 16, the slopes, ditches and the median had been shaped and graded, and those areas had been seeded and mulched except approximately the lower one third of the median. Special Provision H in plaintiff's contract provided those seeded and mulched areas were not to be disturbed by plaintiff, and for that reason they were not a part of the worksite for Project 17. However, the median, ditches and slopes were severely damaged by erosion, and when the Commission required plaintiff to remove the

excess material and to regrade and shape the areas to restore them to the condition in which they had been prepared under Project 16, the previously placed seeding and mulching were destroyed. Although in its brief the Commission does not specifically so state, it seems to be its contention that because by Change Orders 4 and 16, whereby the area to be seeded by plaintiff was changed from 31.8 acres (the lower one third of the median), to 111.4 acres (the total area of the median and slopes), this resulted in a contractual requirement that plaintiff regrade and shape the areas in preparation for the seeding without compensation over and above that provided for seeding.

In support of its contention, the Commission relies on three sections of its Standard Specifications. Section 90.44.1, which is a part of Section 90.40 entitled "Seeding" and which is a subsection to 90.44 entitled "Construction Procedure," provides that "The seedbed shall be prepared, fertilized, and limed in accordance with Sec. 90.4, and shall be in a firm but uncompacted condition with a relatively fine texture at the time of seeding." Section 90.4 is under the title "Fertilizing," and is captioned "Construction Procedure." It provides in subsection 90.4.1 that "The area to be fertilized and limed will be the area designated within the limits of construction; shall have a uniform surface free from rills, washes and depressions; and shall conform to the finished grade and cross section as shown on the plans." Sections 90.4.2 and 90.4.3 provide for liming and fertilizing.

In the change order which authorized payment for seeding a total of 111.4 acres, by reference to a previous change order, the Commission stated: "In a major portion of these areas, erosion, either by water or wind, had disturbed the slopes to a point where they could not be classified as a portion of an even partially finished roadway, as required by Std. Specification 22.20." Plaintiff's evidence was to the effect that the median, slopes and ditches

had to be reshaped and regraded before they could be prepared for seeding. In the Commission's reply brief it asserts that the above Standard Specifications "provide that if the contractor is to both prepare the seedbed and do the seeding, then he should bid the pay item of seeding so as to cover the cost of preparing the seedbed." We are of the opinion that the work required of plaintiff by the Commission in regrading and reshaping the median, ditches and slopes cannot be properly classified as preparing the seedbed within the meaning of the applicable Standard Specifications. Finish grading "to bring the roadway to the required grade, alignment, and cross section," is recognized not to constitute the preparation of the seedbed because under the Standard Specifications it is to be paid for as excavation under Section 23.1. The same is true as to reshaping of the roadway. It is a separate item under Section 21.70 and is to be paid for at a unit price. These items of work include what plaintiff was required to do, and constitute work that was to be done before the preparation of the seedbed. The latter consists of preparing a firm but uncompacted surface of relatively fine texture free from rills, washes and depressions, and then fertilizing and liming. Plaintiff's original bid was $140 per acre for seeding the lower third of the median which had already been graded and shaped under Project 16. That meant that plaintiff was to prepare the seedbed on the graded and shaped areas and then sow the seed. When by change orders the Commission increased the acreage from 31.8 acres to 111.4 acres it cannot reasonably be said that the scope of work to be performed by plaintiff was increased. Under this bid item as changed, plaintiff was to prepare the seedbed and sow the seed on 111.4 acres which had been graded and shaped instead of only 31.8 acres. Another factor lends support to this conclusion. Plaintiff's evidence was to the effect that a reasonable cost for regrading and shaping was just under $1,000 per acre, and this evidence was not challenged by the Commission. Yet, the Commission now urges to this court that the regrading and shaping should be included in the bid price for seeding of $140 per acre. The trial court held that the work of regrading and shaping was not work covered by plaintiff's contract for seeding, and we agree.

In its point VIII the Commission asserts that the trial court failed to give consideration to the fact that "at least a part of the work of restoring the damage caused by erosion was made necessary by the plaintiff's operations."

■■■ The Commission refers to testimony by some of its witnesses to the effect that the paving machine "operated between the medians, in the median area," that after the concrete was poured the median had been "completely demolished or rutted up," that vehicles were operated "on the outside slope," and that batch and water trucks "went up and down the outside shoulder of the pavement." We first note that these activities occurred in connection with the laying of the pavement, or they occurred thereafter. By the time that work was done, the Commission had already taken the position with plaintiff that it had to repair the slopes and median even though it had caused no damage whatever. The slopes and medians had then been damaged by erosion to such an extent that if plaintiff had to repair that damage a few more ruts would be immaterial. Also, plaintiff's evidence was to the effect that any damage it did to forbidden areas was subsequently obliterated by subsequent erosion, and the resident engineer of the Commission testified, at least as to some of the repair work and perhaps all of the work depending on how the testimony is interpreted, that ruts and damage by plaintiff's equipment "were no longer a factor" in the repair of damage. The Commission's position was that all repair work in the median, slopes and ditches was required by plaintiff's contract, and perhaps for that reason it did not attempt to show how much of the damage should be allocated to plaintiff's operations in those areas. In any event, there is no such evidence. The trial

court found that the "reasonable value of the work performed by plaintiff in repairing the damages outside the roadbed *caused by erosion* is $240,957." This finding has support in the evidence, and we defer to that finding.

The Commission contends that the trial court erred in admitting testimony of plaintiff's witness Mr. Carman, its area manager (Point VI) as to the amount of the excavation required in the ditches and median "because the witness was not sufficiently qualified as having been in a position to arrive at an estimate having any reasonable degree of accuracy," and (Point VII) the court erred in admitting his testimony as to the "amount of damages based upon the cost of the work performed less the payment received." We shall first consider Point VI.

 Mr. Carman was an expert witness and clearly qualified as such, but the Commission argues that because he was "not on the job continuously," did not "make any measurements," and did not keep "any daily record of any estimate of erosion," his testimony "as to the amount of erosion is pure speculation." We will not prolong an otherwise lengthy opinion by setting out the testimony of Mr. Carman. It is sufficient to state that he testified that the amount which had to be removed from the median and ditches was approximately the amount that eroded from the roadbed; that the amount varied from place to place on the roadbed; that he measured the amounts and averaged them; and that he had discussed his estimate with the project engineer who said that he "would not argue with [his] estimate." He further testified that he "estimated the material which was blown into the median and ditches was in one manner or another entirely moved in order to re-establish this drainage and this quantity totaled 66,561 cubic yards." He also stated that the customary way to measure excavated material is by cross-sectioning borrow pits before and after excavation, but this could not be

done in this case because material was hauled into as well as out of the borrow pits. The Commission's witnesses testified, in effect, that an accurate estimate could not be made. There is no question but that plaintiff was required to remove a substantial amount of material from the median and ditches. The Commission provided no estimate of the amount and advanced no method by which an accurate measurement could be made, or how the amount could be measured more accurately than the method used by Mr. Carman. What is involved is a measurement of the damages sustained by plaintiff. The rule is set forth in City of Kennett v. Katz Const. Co., 273 Mo. 279, 202 S.W. 558, 559, 562, as follows:

"* * * let it be said * * *, in applying the rule against the recovery of uncertain damages, it is the uncertainty as to their nature, and not as to their measure or extent, that is meant. While the actual amount of damages from the breach of a contract may not be susceptible of exact proof, the law does not permit one whose act has resulted in loss to another to escape liability on this account. The manner of measuring the damages having been ascertained, impossibilities in proving same are not required, but only that the best evidence be adduced of which the nature of the case is capable; in other words, the degree of certainty of the proof is dependent upon the character of the proceeding."

 The trial court found that "Approximately 66,561 cubic yards of material was handled by plaintiff in restoring the shape and elevation of median, slopes and ditches to provide drainage." This was supported by the testimony of Mr. Carman, and his method of computation was the best available under the circumstances. We conclude that it afforded the trial court a reasonable basis for estimating the loss to plaintiff. See Blackburn v. Carlson Seed Company, Mo.App., 321 S.W.2d 520.

As to Point VII. Plaintiff's witness testified as to the amount of damage as to

each of its claims. In doing so the amount of work was determined by an appropriate unit; that is, the movement of a cubic yard of material or the grading of a square yard. A value was then assigned to each unit, and the total amount of damages claimed was computed. After presenting this evidence of the amount of damages, plaintiff put in evidence a computation of damages on another basis. It computed from its payroll records the total cost of all excavation and grading work performed, and then deducted the portion covered by the contract. The balance represented the approximate cost of work claimed by plaintiff not to have been covered by the contract. This latter method resulted in a lesser amount, but an amount fairly close to that arrived at by the first method. The determination of the amount of damages by the trial court was based on the first method, and the Commission offered no evidence that the unit prices used in that computation were unreasonable.

The Commission argues that the second method, based on payroll cost, was not proper because there was no showing that the cost was reasonable, and that since "the contract" in this case was one required to be entered into only after competitive bids, the amount which the work might cost a particular contractor "cannot form the basis for compensation under the contract." This argument seems to be based on the theory that plaintiff's claim is for additional compensation under the contract; not that it is based on a claim for breach of contract. At most the method of showing damages based on payroll cost tended to show the reasonableness of the method based on units of work, which was the method used by the trial court. We see nothing prejudicial to the Commission.

We turn now to plaintiff's appeal. Plaintiff first contends that the trial court erred in ruling for the Commission on Count II of the petition. By that Count plaintiff sought damages in the amount of $138,910 on the basis that the roadbed constructed under Project 16, and furnished by the Commission as a worksite for plaintiff to do the work under Project 17, was damaged by erosion from wind and rain through no fault of plaintiff, and that plaintiff was required by the Commission to restore the roadbed. The trial court held that this damage was a contingency assumed by plaintiff. We note, to clarify the issues, that erosion damage to the roadbed which occurred after the completion of Project 16 and before the execution of the contract for Project 17, was covered by the item in plaintiff's contract under the caption of Embankment in Place, and for the repair of that damage the contract contained a "lump sum" of $20,000. Therefore, at the time the contract was entered into for Project 17, the Commission did furnish to plaintiff a worksite, except for the shortage of 5,012 cubic yards of material previously discussed, which conformed to the specifications, or in the respects it failed by reason of then existing erosion, plaintiff was to be paid to correct the deficiency. The issue to be determined is whether the Commission or the plaintiff is to bear the risk of damage without fault of either party to the worksite after the execution of the contract for Project 17.

Plaintiff contends that there was no provision in its contract imposing upon it the risk of subsequent damage occurring without fault on its part, that the Commission was the owner of the worksite, that plaintiff's contract did not contemplate any work on the roadbed except to repair previously occurring erosion damage and routine subgrading normally performed in connection with and as a part of the paving operations, and that it was an implied condition that the Commission would provide a roadbed as shown on the plans as a worksite upon which plaintiff would perform the work called for by Project 17. The Commission contends, on the other hand that the trial court correctly held that plaintiff was required to restore the roadbed at its own expense because "the area involved was directly related to and affected by plaintiff's work and activities."

The Commission argues that the Standard Specifications contain numerous instances where work on the part of the contractor is required with no specific pay item being provided, and reference is made, as an example, to Section 22, entitled "Subgrade." The Commission also cites and relies on two other provisions in the Standard Specifications. Section 4.1.1 provides that "The intent of the contract is to prescribe a complete work or improvement which the contractor undertakes to do, in full compliance with the plans, specifications, special provisions, proposal, and contract." It is further provided that the contractor is to furnish all implements, tools, materials, and labor, "necessary to the prosecution and completion of the work under the contract." Section 9.2.1 provides that the contractor shall receive and accept the compensation provided for in the contract as full payment for furnishing all materials and for performing all work under the contract, and "for all risk, loss, damage, or expense of whatever character arising out of the nature of the work or the prosecution thereof." These provisions are of little if any help in determining upon which party the risk of repairing damage to the previously prepared roadbed should fall. They provide in effect that plaintiff shall do whatever is necessary to perform the work called for under the contract and shall be paid therefor. The issue still remains as to what work is covered by the contract.

■ It is the general rule, and we think the correct one, in the absence of a provision in the contract to the contrary, that when the contract is for the performance of work on an existing structure which must continue in order that the work under the contract may be performed, and the structure is not wholly under the control of the contractor, as where alterations or additions are to be made to a building, there is an implied condition that the structure on which the work is to be done shall continue in existence, and if the structure is destroyed or damaged before

the work is completed so the work under the contract cannot be performed, without fault of the contractor, the contractor is excused from further performance, at least until the owner restores the structure. 17A C.J.S. Contracts § 466(2)b; Haynes, Spencer & Co. v. Second Baptist Church, 88 Mo. 285, 57 Am.Rep. 413. We necessarily must determine whether plaintiff's contract imposed on plaintiff the responsibility for damages occurring to the roadbed, and as to this issue it can fairly be said that the contract is indefinite and vague.

■ Section 7.9.1 of the Standard Specifications provides that "Until work is accepted by the engineer, it shall be in the custody and under the charge and care of the contractor. The contractor shall rebuild, repair, restore, or make good, at his own expense * * * all injuries or damages to any portion of the work before its completion and acceptance, caused by the action of the elements or from any other reason." The Commission does not cite this section, but if the term "work" includes repair of damage to the previously prepared roadbed, plaintiff contractually assumed the obligation to repair wind and rain erosion damage occurring after the execution of its contract. Section 1.39 defines the term "work" as "The furnishing of all labor, materials, equipment, and other incidentals necessary or convenient to the successful completion of the project and the carrying out of all the duties and obligations imposed by the contract." The contract, in its Notice to Contractors, provides that the "proposed work" includes: "Grading, signing and two concrete pavements each 24 feet wide, separated by a median forming a divided highway, together with any incidental work on the above state road * * *." In the "Itemized Proposal" there are included such items as "Class A Excavation," estimated to consist of 10,399 cubic yards; "Subgrading and Shouldering," estimated to consist of 1720.-8 stations; and Machine Grading, Class 1," estimated to consist of 12.5 stations. We

do not find from the record the purpose of the excavation if the roadbed was to have been prepared under Project 16 so that it was ready for the laying of pavement and the soil cement except for fine grading or minor drifting. Apparently the work referred to in the Itemized Proposal as "Subgrading and Shouldering" was to be performed by working on the roadbed because the term is defined in Section 22.21.1 as consisting of "preparing a subgrade for a concrete pavement with or without an aggregate base and the shaping of the shoulders, fill slopes, inslopes, and ditches as may be required to complete a finished roadway, * * *." In this case, these activities to be performed by plaintiff were limited by Special Provision H and expanded by Special Provision T. The evidence of the Commission shows that plaintiff bladed the material loose from the compacted roadbed, and operated its equipment over the area making it subject to erosive action. This activity undoubtedly was necessary to perform the work under the contract, and plaintiff does not contend that it did not do these things. We cannot, however, go along with the Commission's argument which implies that this activity was not necessary, that plaintiff chose to do it, and that "it [the Commission] retained no control" of plaintiff's work except to see that the final result met the specifications. In so arguing the Commission ignores Section 5.1.1 which provides that "The [Commission] engineer shall in all cases decide any and all questions which may arise concerning * * * the manner of performance * * * of all work; * * *." But, in any event, work by plaintiff was to be performed on the roadbed in preparing it for the pavement and soil cement shoulders, and this was the area where the erosion occurred. We necessarily reach the conclusion that "work," as defined in Section 1.39 and used in Section 7.9.1, included the activity of maintaining and establishing the roadbed to the condition turned over to plaintiff preparatory to the laying of the paving and soil cement, and that by reason of Section 7.9.1

the contract imposed on plaintiff the responsibility of repairing erosion damage to the roadbed.

Plaintiff next asserts that the trial court erred in failing to include interest in its judgment. Plaintiff made a formal claim to the Commission for payment based on work performed by it outside of its contract. It renewed its claim when it filed suit, and in each count plaintiff sought damages with interest at 6%.

An allowance of interest must be based upon either a statute or a contract, express or implied. Boyle v. Crimm, 363 Mo. 731, 253 S.W.2d 149, 157. Plaintiff does not claim, and we do not find a contract for interest in this case. However, § 408.020 RSMo 1959, V.A.M.S., provides that "Creditors shall be allowed to receive interest at the rate of six per cent per annum, when no other rate is agreed upon, * * * on accounts after they become due and demand of payment is made; * * *." In Schmidt v. Morival Farms, Mo., 240 S.W.2d 952, 961, this court stated that "Interest is the measure of damages for failure to pay money when payment is due even though the obligor refuses payment because he questions legal liability for all or portions of the claim." In Laughlin v. Boatmen's Nat. Bank of St. Louis, 354 Mo. 467, 189 S.W.2d 974, this court held that an unliquidated claim for the reasonable value of an attorney's services was an "account" within the meaning of § 408.020. In this case plaintiff's claim was based on a breach of contract, and the value of the services outside of the scope of the contract required by the Commission to be performed by plaintiff as a condition to any payment for the work covered by the contract was the measure of damages. In this respect plaintiff's claim was comparable to the amount of recovery under quantum meruit, and in the Laughlin case it was further said: "On principle there is no reason for denying interest when the action is in quantum meruit and the claim is unliquidated in the sense that the amount is to be measured and determined

by the standard of the reasonable value of the services, * * *. If the defendant is liable for the reasonable value of services he is under a legal duty to liquidate the sum due and interest should be allowed from the time when he should have paid. * * * This principle has been applied often in actions for the reasonable value of work and labor * * *." See also Mid-West Engineering & Constr. Co. v. Campagna, Mo., 421 S.W.2d 229, 234.

▇▇ The Commission argues that "where as here, * * * there is a dispute between the parties as to the very contract upon which plaintiff seeks to recover, then the allowance of interest is within the discretion of the court." No authority is cited, except Boyle v. Crimm, 363 Mo. 731, 253 S.W.2d 149, in support of the propositions that the allowance of interest must be based either upon a statute or a contract and that "*in equity* such an allowance is a matter for the chancellor's discretion." This is not an action in equity, but even so, in Leggett v. Missouri State Life Insurance Company, Mo., 342 S.W.2d 833, 932, this court reviewed Boyle v. Crimm, supra, and held that even in an equity case the court "could not ignore and disregard, but was bound to enforce, the plain provisions of § 408.020, * * *." The Commission also cites United States v. Bass, 8 Cir., 215 F.2d 9, in support of its contention that the allowance of interest is within the trial court's discretion. That case did not involve § 408.020, and in fact supports plaintiff's claim in that it recognizes that a statutory provision, if one exists, governs. We conclude that plaintiff made a demand on the Commission, and that its claim for compensation was an account within the meaning of § 408.020. Therefore, the judgment of the trial court should have included interest at six percent per annum from the date of the demand, which in this case was when plaintiff filed its claims with the Commission.

The judgment of the trial court is affirmed except as to the right of plaintiff to interest, and the case is remanded with directions that a new judgment be entered including interest at the rate of six per cent per annum from the date of plaintiff's demand to the date of the original judgment.

BARRETT, C., not sitting.

PRITCHARD, C., dissents.

PER CURIAM:

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

DONNELLY, P. J., MORGAN, J., and HOLMAN, Alternate Judge, concur.

FINCH, J., not sitting.